# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 94-KA-00191-SCT

*CALVIN McFARLAND a/k/a CALVIN L. McFARLAND*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 8/2/93 |
| TRIAL JUDGE: | HON. RICHARD WATSON |
| COURT FROM WHICH APPEALED: | WILKINSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DENNIS C. SWEET, III |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOHN H. EMFINGER |
| DISTRICT ATTORNEY: | ROBERT L. WILLIAMS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/20/97 |
| MOTION FOR REHEARING FILED: | 12/4/97 |
| MANDATE ISSUED: | 3/11/98 |

**BEFORE PRATHER, P.J., ROBERTS AND MILLS, JJ.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. On July 1, 1993, a jury in the Circuit Court of Wilkinson County found Calvin McFarland guilty of two counts of vote fraud. On August 2, 1993, the circuit court sentenced McFarland to serve five years and pay a $1,000 fine for each count, with one of the five-year sentences suspended. After the circuit court denied McFarland's motion for a new trial, McFarland perfected his appeal to this Court, assigning as error the following issues:

> **I. WHETHER THE TRIAL COURT ERRED IN DENYING McFARLAND'S MOTION FOR INDIVIDUAL SEQUESTERED VOIR DIRE.**

> **II. WHETHER THE TRIAL COURT ERRED IN GRANTING THE STATE'S *BATSON* MOTION.**

> **III. WHETHER THE TRIAL COURT ERRED IN DENYING McFARLAND'S *BATSON* MOTION AND IN FAILING TO ALLOW DEFENSE COUNSEL TO MAKE**

**A FULL RECORD.**

**IV. WHETHER THE TRIAL COURT ERRED IN EXCUSING VENIRE MEMBERS WITHOUT ALLOWING DEFENSE COUNSEL TO FULLY QUESTION THEM.**

**V. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTION TO CALL WEVLYN JAMES AS A HOSTILE WITNESS.**

**VI. WHETHER THE TRIAL COURT ERRED IN FAILING TO ALLOW DEFENSE COUNSEL A FULL OPPORTUNITY TO CROSS-EXAMINE SAM SMITH.**

**VII. WHETHER THE JURY WAS SWORN PRIOR TO HEARING THE CASE, DELIBERATING AND RENDERING A VERDICT.**

**VIII. WHETHER THE EVIDENCE DID NOT SUPPORT A CONVICTION ON COUNT III.**

**IX. WHETHER THE EVIDENCE DID NOT SUPPORT A CONVICTION ON COUNT I.**

**X. WHETHER THE JURY INSTRUCTIONS WERE IMPROPER IN THAT THEY DID NOT FULLY INFORM THE JURY OF THE ELEMENTS OF THE CRIMES CHARGED.**

**XI. WHETHER THE TRIAL JUDGE SHOULD HAVE RECUSED HIMSELF FROM SITTING IN THIS TRIAL.**

## FACTS

¶2. Calvin McFarland was an incumbent candidate in the 1991 elections for the Wilkinson County Board of Supervisors. The Democratic Primary in September resulted in several run-off elections, including one for the nomination to McFarland's seat. McFarland was unsuccessful in the run-off election held on October 8, 1991, and his opponent was named the Democratic candidate for the general election. There were challenges to several of the run-off elections, which were formally contested.

¶3. On June 5, 1992, agents from the Attorney General's office seized all of the ballots at the Wilkinson County Circuit Clerk's office in an investigation into allegations of vote fraud, which investigation resulted in fourteen indictments against various then-current and former elected officials in the county, including Calvin McFarland. In September of 1992, the indictment against McFarland was dismissed, and he was re-indicted on December 4, 1992.

¶4. The indictment charged McFarland with six counts of vote fraud under Section 23-15-753 of the Mississippi Code. Count I charged him with falsely signing the name "Lottie James" to the affidavit on the envelope containing the absentee ballot marked by Lottie James. The count also charged McFarland with signing the "Attesting Witness Certificate," which falsely signified that the true signature of Lottie James had been placed on the envelope. Each of the remaining five counts charged McFarland with falsely signing another person's name to that person's application for an

absentee ballot.

¶5. After a trial in the Circuit Court of Wilkinson County from June 29 to July 1, 1993, the jury found McFarland guilty of Counts I and III, and found him not guilty of the other four counts. On August 2, 1993, the trial court sentenced McFarland to serve five years and pay a $1,000 fine for each of the two counts, with one of the five-year sentences suspended.

## DISCUSSION

### I. WHETHER THE TRIAL COURT ERRED IN DENYING McFARLAND'S MOTION FOR INDIVIDUAL SEQUESTERED VOIR DIRE.

¶6. During the course of voir dire of potential jurors, it became apparent that many venire persons had seen media coverage of the election challenges and vote fraud cases in the county. Defense counsel requested that he be permitted to conduct individual sequestered voir dire of the jurors, which request the trial court denied. Later, during jury selection, the following exchange occurred:

> MR. SWEET: And I say this wholeheartedly, Your Honor, and I'm only trying to select a fair jury. Your Honor, I asked about going to a sequestered, you know, and I asked the Court about that --
>
> THE COURT: I know you did, and I said it wasn't necessary.
>
> MR. SWEET: So, Your Honor, I couldn't go into everything that they've heard. But when --
>
> THE COURT: I think it's been gone into by the Court and counsel for both cases, that the news media, they've seen it in the newspapers; it's been repeatedly in the newspapers, and the Court takes judicial knowledge of that fact.

McFarland argues that in light of the extensive pretrial publicity about election challenges and vote fraud cases, the trial court erred in denying his motion for individual sequestered voir dire.

¶7. At the time of trial, the manner in which voir dire shall be conducted in criminal cases was governed by Mississippi Uniform Criminal Rule of Circuit Court Practice 5.02,[1] which provided:

> In the voir dire examination of jurors, the attorney shall direct to the entire venire questions only on matters not inquired into by the court. Individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the court. No hypothetical questions requiring any juror to pledge a particular verdict will be asked.

We have held that this rule allows a circuit court, in its own discretion, to utilize individualized, sequestered voir dire. *Carr v. State*, 655 So. 2d 824, 842 (Miss. 1995). We have further held, however, that the rule does not require more than what it states on its face, and that trial judges who denied individual sequestered voir dire acted within their discretion granted by the rule. *Carr*, 655 So. 2d at 842; *Russell v. State*, 607 So. 2d 1107, 1110 (Miss. 1992); *Hansen v. State*, 592 So. 2d 114, 126 (Miss. 1991). In fact, we have never found error where a trial judge denied a motion for individual sequestered voir dire.

¶8. In the capital murder case of **Carr v. State**, *supra*, the trial court denied the defense's request for individual sequestered voir dire regarding the jurors' exposure to extensive pretrial publicity. 655 So. 2d at 842. On appeal, we noted that in [**Mu'Min v. Virginia, 500 U.S. 415, 427 (1991)**](#), the Supreme Court stressed the wide discretion trial courts enjoy in conducting voir dire with respect to the issue of pretrial publicity. **Carr**, 655 So. 2d at 843. The Supreme Court stated in [**Mu'Min**](#):

> Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror. The trial court, of course, does not impute his own perceptions to the jurors who are being examined, but these perceptions should be of assistance to it in deciding how detailed an inquiry to make of the members of the jury venire.

[500 U.S. at 427](#).

¶9. In **Carr**, the trial court asked the collective venire about the effect of pretrial publicity or information about the case, and asked if there was any reason that a juror felt that he or she could not be fair and impartial. 655 So. 2d at 843. Any juror who responded affirmatively was further questioned, and those who stated that they had already formed an opinion in the case were excused. **Id**. We found no abuse of discretion in the court's denial of individual sequestered voir dire. **Id**.

¶10. In the case *sub judice*, the trial judge inquired of the entire venire concerning pretrial publicity and knowledge of the case. Two jurors raised their hands, and the judge questioned them further to determine whether their knowledge might affect or prejudice them in any way. When the jurors indicated that they could not be fair and impartial, they were excused. The attorneys then conducted extensive examination of the venire regarding exposure to pretrial information, and every juror who indicated an inability to be fair and impartial was excused. We find that the trial court did not abuse its discretion in denying McFarland's motion for individual sequestered voir dire.

## II. WHETHER THE TRIAL COURT ERRED IN GRANTING THE STATE'S *BATSON* MOTION.

¶11. In selecting the first twelve jurors during jury selection, the defense exercised peremptory challenges on four jurors, all of whom were white. The State then made the following *Batson* challenge:

> MR. EMFINGER: Your Honor, pursuant to Georgia v. McCollum and the State case after that, as we recall the defendant has used all of his preemptory [sic] challenges here against white jurors, and we would call upon him to exercise or show some reason other than race as to why they were struck.
>
> THE COURT: All right, what's the first --
>
> MR. EMFINGER: Janet McCarstle.
>
> MR. SWEET: We'd like to lodge a, on the issue the defendant believes, Your Honor, we submit he doesn't have to justify any challenges, but I understand the Court is asking us to, and I'll be

happy to.

Janet McCarstle, Your Honor, she was juror number 1; she said she had read about the case; she was aware of the prior case in the newspaper, that she had heard about the challenge to the election, that she had followed the challenge on the election. And, Your Honor, she on every case -- we questioned her about either hearing about the prior case, challenge, the investigation; she answered in the affirmative on every one of those. Now, Your Honor, it was hard to go over it with her in front of all the jurors and prejudice them with what she had heard, but the extent and the fact that she had heard something on each of them and challenged and said she followed the challenge is the basis of our strike.

THE COURT: What says the State?

MR. EMFINGER: Your Honor, the questions were asked repeatedly from the Court, from both the State and the defense about people's level of knowledge. Some jurors were questioned seemingly at random or not necessarily at random about details of it, but all of the jurors indicated similar knowledge following, the whole stack of them out there to have similar knowledge after being inquired into.

MR. SWEET: Your Honor, all jurors did not respond. For instance, Rose Etta Harris, Juror Number 16 that they struck did not respond that she had heard anything; and Annie Mattire did not respond; Victoria James did not respond; James E. Brown did not respond. There were several on there, Your Honor -- Edith Conrad did not respond.

THE COURT: All right, we're not going into any more detail. Are the four jurors that were stricken by the defendant all white?

MR. SWEET: Yes, Your Honor.

THE COURT: The Court recalls questioning this juror in detail; she had read the newspaper account, and the Court finds as a fact that this is a rural county, and as to Janet McCarstle, the Court is going to reinstate her as a juror. The entire county has read it.

Upon the defense's explanation, the trial court allowed the other three peremptory strikes to stand. McFarland argues that the trial court erred in granting the State's *Batson* motion as to juror Janet McCarstle.

¶12. McFarland first contends that in a *Batson* evaluation of peremptory strikes against white jurors, the court must conduct an equal protection analysis. Because whites are not a suspect class for equal protection purposes, McFarland argues, the State bears a heavy burden to establish invidious racial motivation in challenging a defendant's peremptory strikes against white jurors, for which proposition he cites two Florida cases, **Rome v. State**, 627 So. 2d 45 (Fla. Dist. Ct. App. 1993) and **McClain v. Florida**, 596 So. 2d 800 (Fla. Dist. Ct. App. 1992). McFarland argues that the trial court erred in failing to apply this heavier burden, and that even under the traditional *Batson* analysis, the court erred in granting the State's motion. The State argues that McFarland's cited proposition is peculiar to the First District Court of Appeals of Florida and is inconsistent with the *Batson* line of cases both in the Supreme Court and in this State, and that under the proper *Batson* analysis, the trial court

committed no error. We agree with the State.

¶13. In *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), the Supreme Court held that the prosecution was prohibited from racially discriminating through its exercise of peremptory strikes. In *Georgia v. McCollum*, 505 U.S. 42, 59 (1992), the Court extended this prohibition to forbid the defendant as well from engaging in intentional discrimination "on the ground of race" in the exercise of peremptory challenges. Accordingly, in *Griffin v. State*, 610 So. 2d 354, 356 (Miss. 1992), we upheld the State's successful *Batson* challenge to the defendant's use of peremptory strikes against white jurors on the basis of race. The determinative issue, therefore, is not whether whites are a suspect class, but whether race is a suspect classification, which it certainly is. Where the State has challenged a defendant's peremptory strikes on the basis of race, regardless of whether the struck jurors were black or white, the court should use the same *Batson* analysis.

¶14. Under *Batson*, the party objecting to the peremptory challenge must first make a *prima facie* showing that race was the criteria for the exercise of the peremptory strike. 476 U.S. at 96-97; *Stewart v. State*, 662 So. 2d 552, 557 (Miss. 1995). The burden then shifts to the party exercising the challenge to offer a race-neutral explanation for striking the potential juror. *Batson*, 476 U.S. at 97-98; *Stewart*, 662 So. 2d at 558. Finally, the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory. *Batson*, 476 U.S. at 98; *Stewart*, 662 So. 2d at 558.

¶15. In the case *sub judice*, the State satisfied the first prong of the three-step analysis by pointing out that McFarland used all of his peremptory strikes against white jurors, thereby giving rise to a reasonable inference of purposeful discrimination. *See Batson*, 476 U.S. at 97 (stating that "pattern" of strikes may suffice for *prima facie* showing). The defense then met its burden by offering a race-neutral reason for striking McCarstle, i.e., she had read newspaper accounts of the case and the election challenge. Our determination of this issue, therefore, turns on whether the trial judge abused his discretion in finding that the defense's race-neutral explanation was pre-textual and that McCarstle was stuck because of her race.

¶16. We accord great deference to the trial court in determining whether the offered explanation under the unique circumstances of the case is truly a race-neutral reason. *Stewart*, 662 So. 2d at 558. We will not reverse a trial judge's factual findings on this issue "unless they appear clearly erroneous or against the overwhelming weight of the evidence." *Id.* (quoting *Lockett v. State*, 517 So. 2d 1346, 1350 (Miss. 1987)). One of the reasons for this is because the demeanor of the attorney using the strike is often the best evidence on the issue of race-neutrality. *Stewart*, 662 So. 2d at 559 (citing *Hernandez v. New York*, 500 U.S. 352, 365 (1991)). In addition to the demeanor of the attorney, the trial court must consider all other relevant circumstances, such as the way prior peremptory strikes have been used and the nature of the questions on voir dire. *Stewart*, 662 So. 2d at 559.

¶17. In the case *sub judice*, McFarland used all of his peremptory strikes on white jurors. As the State pointed out to the trial judge, virtually all of the jurors -- both black and white -- had prior knowledge of the case. As the Fifth Circuit stated in *U.S. v. Bentley-Smith*, 2 F.3d 1368, 1373-74 (5th Cir. 1993), a party may attempt to refute the other party's race-neutral reason by "pointing out that similar claims can be made about non-excluded jurors." After considering the voir dire examination of McCarstle, the trial judge reinstated her as a juror, apparently not believing

McFarland's explanation for striking her in light of the fact that "[t]he entire county has read it." We shall defer to the trial judge's discretion under these circumstances, and thus he did not err in granting the State's *Batson* motion.

### III. WHETHER THE TRIAL COURT ERRED IN DENYING McFARLAND'S *BATSON* MOTION AND IN FAILING TO ALLOW DEFENSE COUNSEL TO MAKE A FULL RECORD.

¶18. In selecting the first twelve jurors, the State exercised peremptory strikes against six venire persons, all of whom were black. The defense raised a *Batson* challenge, and the trial court required the State to explain the strikes, after which the court allowed the strikes to stand. McFarland first argues that the trial court erred in failing to allow defense counsel to make a full record of the prosecution's peremptory strikes against black jurors in a previous vote fraud case. The alleged error occurred during the following exchange:

> MR. SWEET: Your Honor, they have not struck a black -- in the last trial on voter fraud against Ms. Sandra Sewell --

> THE COURT: We're trying this case; now, we're trying this case and this case alone. I don't want this record confused with another lawsuit that was a mistrial; it was not reached a conclusion, and I don't want that in the record.

> MR. SWEET: I understand that they had a Batson violation in that case, Your Honor, where they've struck all blacks. That's the only thing I was showing; I was showing a pattern, a practice; and they've struck all blacks here. And we'd ask them to justify Carter, Your Honor, which is there S-5.

> THE COURT: All right, I'll ask you about Carter.

¶19. McFarland cannot complain here. By his own statement, defense counsel cited the earlier case in order to show a pattern of peremptory strikes by the prosecution against black jurors in vote fraud cases, which was "the only thing I was showing." He pointed out that the prosecution had peremptorily struck only black jurors in the previous case as well as in the instant case, which argument the trial court accepted, as it then required the State to offer a race-neutral explanation. Apparently satisfied with the court's action, the defense made no proffer of any actual venire statistics from the earlier trial. We find that no error occurred here.

¶20. McFarland also argues that the trial court erred in accepting the State's race-neutral reasons and in allowing the strikes to stand. The State offered the following reasons for the challenged strikes: (1) Juror Cleveland Holmes stated that he had been a schoolmate of McFarland and that he and McFarland were longstanding friends; (2) the prosecution was informed that Juror Bessie Dennis' son was a close friend of McFarland; (3) the prosecution was informed that Juror Rosie Harris lived in the district in which McFarland had served, and that McFarland had taken a special interest in her and provided assistance to her on a number of occasions; (4) the prosecution understood that Juror Ervan Carter was a good friend of McFarland's brother; (5) Juror Donald Ray Carter's sister worked for the Wilkinson County Chancery Clerk, another vote fraud defendant who had worked closely with McFarland while McFarland was on the Board of Supervisors; and (6) the prosecution understood

that Juror Joseph Edward Miles had previous problems with law enforcement, and that because he had a military background, he would be a leader on the jury capable of influencing the jury with his attitude towards law enforcement.

¶21. The defense made no attempt to rebut the State's race-neutral explanations, but rather pointed out that regarding some of the struck jurors, the prosecution did not question those jurors during voir dire regarding the reasons for the strikes. McFarland argues that the State's failure to question those jurors regarding the reasons for ultimately striking them reveals that the State's offered reasons were "sham" explanations. We rejected this very argument, however, in ***Lockett v. State***, 517 So. 2d 1346, 1353 (Miss. 1987), wherein we stated:

> We decline to set any limits on the prosecutor's use of any legitimate informational source heretofore or hereafter available as to jurors. Furthermore, *the prosecutor does not have to question a juror in open court about such information before using it as a racially neutral ground to make a peremptory strike,* as long as the source of the information and the practice itself are not racially discriminatory.

***Lockett***, 517 So. 2d at 1353 (emphasis added). In the case *sub judice*, because the defense failed even to attempt to rebut the State's race-neutral reasons, and because the defense has failed to argue, much less demonstrate, that the State's informational sources were racially discriminatory, we find that the trial court did not abuse its discretion in allowing the strikes to stand.

### IV. WHETHER THE TRIAL COURT ERRED IN EXCUSING VENIRE MEMBERS WITHOUT ALLOWING DEFENSE COUNSEL TO FULLY QUESTION THEM.

¶22. The trial court excused twelve jurors during voir dire by the court. One of the jurors, Juror William Edward Medley, stated that he grew up with McFarland, went to school with McFarland, and had remained friends with McFarland throughout the years. Although he stated that could still serve as a fair and impartial juror, the trial court excused him anyway, after which the following exchange occurred:

> MR. SWEET: Your Honor, may we approach the bench?
>
> THE COURT: No, Sir, I told you to take it up in recess. This man says he's a friend of longstanding with Mr. McFarland, and I'm going to excuse him.
>
> MR. SWEET: Yes, Sir, but I thought he said it wouldn't be a burden for him to serve as a juror in the case.
>
> THE COURT: I excused him, Mr. Sweet.
>
> MR. SWEET: Yes, Sir, Your Honor.

Another juror, Juror Roosevelt Tolliver, stated that he and McFarland had worked together, that they were friends, and that they had visited in each other's homes. Again, although he stated that his friendship with McFarland would have no influence upon him as a juror, the trial court excused him anyway, after which the following comments were made:

THE COURT: As I emphasize once again to this jury, this is a period to speak the truth, the fact that anybody knows someone or knows the lawyers or someone else; that's not any reflection upon the person whatsoever. This is a period during the trial, as I have said several times, to speak the truth.

Someone else knew --

MR. SWEET: Your Honor, if I may just approach the bench for one moment.

THE COURT: Yes, Sir. Don't make a habit of it.

After the unrecorded bench conference, the trial court proceeded with its voir dire.

¶23. McFarland argues that the trial court erred in excusing jurors without allowing defense counsel to fully question them, citing **Mack v. State**, 650 So. 2d 1289, 1305 Miss. 1994, *cert. denied*, 116 S.Ct. 214 (1995) for the principle that trial courts "must take care not to hinder a full exploration of a juror's predispositions, by hypothetical or otherwise." McFarland contends further that the trial court erred in excusing jurors who stated that they could be fair and impartial. We find that these arguments must fail.

¶24. We have stated that an attorney "has the right to question jurors for cause *after* they have been determined to be qualified jurors on voir dire by the court." **Peters v. State**, 314 So. 2d 724, 727 (Miss. 1975) (emphasis added). Furthermore, Miss. Code Ann. § 13-5-79 (1972) provides, "Any juror shall be excluded, however, if the court be of the opinion that he cannot try the case impartially, *and the exclusion shall not be assignable as error*." (emphasis added). We have interpreted this statute literally, holding that "once the judge exercised his discretion and determined that the jurors probably could not be impartial, then the determination may not be assigned on appeal as an error." **Coverson v. State**, 617 So. 2d 642, 646 (Miss. 1993). This assignment of error therefore is procedurally barred. Furthermore, it is substantively without merit.

¶25. Trial judges have "broad discretion to determine whether a prospective juror can be impartial -- *notwithstanding the juror's admission under oath that he or she can be impartial*." **Coverson**, 617 So. 2d at 646 (emphasis added). During voir dire by the court, the trial judge excused twelve jurors -- six because of their close relationship to McFarland and six who stated that they could not be fair or that they would be influenced by their close relationship to McFarland. We find that the trial court did not abuse its discretion in excusing these jurors.

¶26. McFarland also argues that the trial court erred in asking leading questions during voir dire. There are only two questions of which McFarland complains. After Juror William Edward Medley stated that he grew up with McFarland, that he and McFarland were friends, and that they had remained friends throughout the years, the trial judge asked him, "Don't you feel like it would be a burden upon you to try to serve as a fair and impartial juror if you're a friend of Mr. McFarland?" Juror Medley responded in the negative, but the judge excused him anyway. Then, after Juror Roosevelt Tolliver stated that he and McFarland had worked together and were friends, the trial judge asked him, "I'll ask you the same question: having been associated with Mr. McFarland for some period of fifteen years and riding back, wouldn't that have some influence on you?" Juror Tolliver responded in the negative, but the judge excused him as well. McFarland argues that in

asking these questions, the trial judge abandoned his neutrality and became an advocate, for which he cites *Davis v. State*, 660 So. 2d 1228, 1258-59 (Miss. 1995) (finding no error where prosecutor, not judge, asked leading questions during voir dire).

¶27. Indeed, trial judges should avoid asking leading questions during voir dire, for such questions "are the tool of advocacy, not neutrality." *Davis*, 660 So. 2d at 1258 (quoting *Schwenke v. State*, 768 P.2d 1031, 1033 (Wyo. 1989)). However, there were only two instances of leading questions asked by the judge in the case *sub judice*, and they were both asked of jurors who had already expressed close relationships with McFarland. McFarland has failed to demonstrate that the jury selected was not fair and impartial. Therefore, we find that the two isolated questions, if error, were only harmless.

### V. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTION TO CALL WEVLYN JAMES AS A HOSTILE WITNESS.

¶28. Count I of the indictment charged McFarland with vote fraud regarding the absentee ballot of Lottie James, who died prior to trial. Wevlyn James, Lottie James' granddaughter, was the Wilkinson County Tax Assessor and Collector, and she had been charged with vote fraud in connection with the October 8, 1991 elections, to which charge she had pleaded guilty. Concerning the charge against McFarland, she had initially given investigators a statement that the signatures on the ballot were in fact her grandmother's, but she later gave a statement implicating McFarland.

¶29. Wevlyn James, when called by the State during its case-in-chief, testified that she was telephoned by "Cal" with a request to send her an absentee ballot for her grandmother, that she received the ballot, that she could not take the ballot to her grandmother so she called McFarland and told him that she would give it back to him, that she took the ballot and placed it in McFarland's car, and that the signature thereafter placed on the envelope was not her grandmother's. During the prosecution's examination of her, the defense objected to the prosecutor asking leading questions and being argumentative with the witness. The prosecutor then requested permission to lead the witness as a hostile witness, which request the trial court granted. McFarland argues that Wevlyn James' testimony was consistent with her second statement given to investigators, and that because the prosecution was therefore not surprised by her testimony, the trial court erred in allowing the prosecution to ask leading questions. This assignment is without merit.

¶30. It is within the trial judge's discretion to allow leading questions, and unless there has been an abuse of discretion to the prejudice of the complaining party, it is not reversible error. *Jones v. State*, 606 So. 2d 1051, 1059 (Miss. 1992). Mississippi Rule of Evidence 611(c) provides that "[w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions." In *Harris v. Buxton T.V., Inc.*, 460 So. 2d 828, 833 (Miss. 1984), we set forth the following test to determine how closely the witness must be identified with the adverse party in order to be considered hostile:

> (1) If the witness' acts or omissions are the predicate for a party's claim or defense, . . ., then that witness is ordinarily sufficiently identified with an adverse party and may be called as an adverse witness and interrogated by leading questions.

> (2) If the conduct of the witness plays such an integral part in the transaction or occurrence

which is the subject of the action and which gives rise to . . . potential liability, . . ., then again the witness is said to be sufficiently identified with the adverse party so that the witness may be called as an adverse witness and cross examined.

The Comment to Rule 611 states that the Advisory Committee is cognizant of the *Harris* decision but considers the interpretation and application of the phrase "identified with the adverse party" to be broader than that expressed in *Harris*.

¶31. In the case *sub judice*, Wevlyn James' testimony makes clear that her acts were a predicate for the State's charge against McFarland, and that her conduct played an integral part in the occurrence which was the subject of the prosecution. Thus, even without using the broader interpretation suggested by the Comment to Rule 611, this Court holds that Wevlyn James was sufficiently identified under *Harris* with the adverse party to permit leading questions. Furthermore, before the prosecutor requested permission to lead her, she appeared very reluctant to identify McFarland as the man who called her and as the man whom she later called. She testified that when a man identifying himself as "Cal" called her, "I assumed it was Calvin McFarland, but some people sound the same on the telephone. He did not give his last name." When asked whom it was that she called after receiving the ballot, she stated that "I'm assuming I called Calvin." Then, after the court granted the prosecutor's request to ask leading questions, she admitted that she had known McFarland for many years and recognized his voice, and that she dialed McFarland's number and spoke with him. Clearly, Wevlyn James initially was less than forthcoming in answering the prosecutor's questions, and thus leading questions were necessary to develop her testimony. The trial court did not abuse its discretion in allowing the prosecutor to examine Wevlyn James as an hostile witness.

### VI. WHETHER THE TRIAL COURT ERRED IN FAILING TO ALLOW DEFENSE COUNSEL A FULL OPPORTUNITY TO CROSS-EXAMINE SAM SMITH.

¶32. At the time of the 1991 elections, Sam Smith was the Circuit Clerk of Wilkinson County, whose duty it was to register voters, maintain the voting rolls and oversee the elections. Mr. Smith was not indicted for any criminal violations in connection with the September and October 1991 elections. The State called Mr. Smith to testify regarding his office's procedures for sending out, receiving and handling absentee ballot applications and absentee ballots, and to testify that the people whose ballot application signatures McFarland was charged with signing were registered voters. During cross examination of Mr. Smith, the following exchange occurred:

[MR. SWEET:] My question to you is this: if somebody called you on the phone, you may not know -- may not recognize that person's voice, and you may not know who it is except for who they tell you it is; isn't that right?

A. That's correct.

Q. But you would send a ballot anyway?

A. That's correct.

Q. Have you been indicted for what is it sixty or seventy times you did that?

MR. EMFINGER: Your Honor, I object; this defendant is not on trial here today.

THE COURT: And I sustain the objection. Now, you ask the questions and you let him answer them, and stick to this case. This case.

MR. SWEET: Your Honor, he raised the question.

THE COURT: You ask the questions and let the witness answer them; that's the process of court rules.

MR. SWEET: I understand that --

THE COURT: You abide by the rules; just go ahead and ask the questions.

MR. SWEET: Your Honor, the only thing I was going to -- he asked him about the practice of the Circuit Clerk's office.

THE COURT: Well, you ask him questions, and I will require him to answer them if they're relevant; go ahead and ask the question.

McFarland argues that the trial court erred in failing to allow defense counsel to fully question Mr. Smith regarding any favorable treatment by the State so as to demonstrate Mr. Smith's possible bias in testifying for the State.

¶33. Mississippi Rule of Evidence 611(b) allows wide open cross examination of witnesses, and Rule 616 allows evidence of bias for the purpose of attacking the credibility of a witness. "Evidence that a material witness has received favored treatment at the hands of law enforcement authorities, particularly where that witness is himself subject to prosecution, is probative of the witness' interest or bias and may be developed through cross-examination or otherwise presented to the jury." *Suan v. State*, 511 So. 2d 144, 147-48 (Miss. 1987). Therefore, defense counsel may have had a colorable argument that he should have been permitted to question Mr. Smith regarding any favorable treatment by the State. However, the defense failed to make a proffer at trial, and has failed to demonstrate in its brief, that Mr. Smith was subject to prosecution for the "sixty or seventy" instances in which he sent out applications and ballots after having received requests over the telephone. In fact, defense counsel did not even make this argument at trial.

¶34. After the trial court sustained the State's objection, defense counsel stated that "the only thing I was going to -- he asked him about the practice of the Circuit clerk's office." The record reflects that defense counsel conducted extensive cross examination of Mr. Smith regarding the practice of the Circuit Clerk's office, and that defense counsel was not limited in this regard. Because McFarland failed at trial to make a proffer or even to argue that Mr. Smith received favorable treatment from the State, we find that any error was not properly preserved for review.

### VII. WHETHER THE JURY WAS SWORN PRIOR TO HEARING THE CASE, DELIBERATING AND RENDERING A VERDICT.

¶35. McFarland argues that the jury in this case was never sworn and thus a reversal is required. He points out that the record does not reflect that the trial judge administered the required oath to the jurors after they were selected and before opening statements. We find this assignment of error to be without merit.

¶36. In the armed robbery case of **Young v. State**, 425 So. 2d 1022, 1025 (Miss. 1983), the defendant argued on appeal that because the record did not reflect that the jury was specially sworn to try the issues at the outset of the trial, the trial court committed reversible error. We noted that although the beginning of the record did not indicate whether the jury was specially sworn, the first part of the judgment so reflected. **Young**, 425 So. 2d at 1025. We declined to reverse, stating that "the presumption is that the trial judge properly performed his duties and that this rebuttable presumption has not been overcome." **Id**. (quoting **Bell v. State**, 360 So. 2d 1206, 1215 (Miss. 1978) ).

¶37. In the case *sub judice*, in his objection to a defense motion raised after the jury was selected and released for lunch, the prosecutor stated, without challenge by the defense, that "the jury has been sworn and impaneled." Furthermore, the first parts both of the Judgment of Conviction and of the Judgment state that the jury was duly sworn before hearing the evidence and arguments. We find that McFarland has failed to overcome the presumption that the jury was properly sworn.

## VIII. WHETHER THE EVIDENCE SUPPORTED A CONVICTION ON COUNT III.

¶38. Count III, of which the jury found McFarland guilty, charged McFarland with falsley signing the name "Cassie L. Neyland" to Ms. Neyland's application for an absentee ballot. McFarland argues that the evidence was insufficient to support a conviction on this count. We find that this argument must fail.

¶39. McFarland first argues that the evidence was insufficient for a conviction because there was no evidence that he was not authorized to sign Ms. Neyland's name to her application, a proposition for which he cites no authority. In any event, we require strict compliance with the statutes concerning absentee ballots in order to ensure the integrity of absentee ballots. **Lewis v. State**, 664 So. 2d 177, 185 (Miss. 1995). An elector applying for an absentee ballot must complete the application form as provided in Miss. Code Ann. § 23-15-627 (Supp. 1996), which application form requires the signature of the *absent elector*. Nowhere in the statutes is it provided that an absent elector may authorize another person to sign the elector's name to the elector's application for an absentee ballot. This argument is without merit.

¶40. McFarland also argues that the evidence was insufficient for a conviction because the evidence showed that Cassie Neyland's absentee ballot was not returned to the Circuit Clerk's office to be counted, another proposition for which he cites no authority. McFarland points out that Jury Instruction S-1 required the jury to find beyond a reasonable doubt that the ballot envelope was returned to the Circuit Clerk's office in order to find McFarland guilty. The flaw in McFarland's argument, however, is that Instruction S-1 set forth the elements of Count I, which charged McFarland with vote fraud in connection with the ballot envelope of Lottie James. The elements of Count III, which charged McFarland with vote fraud in connection with Cassie Neyland's application for an absentee ballot, were provided in Instruction S-3, not S-1. Obviously, in order for McFarland to be found guilty of vote fraud in connection with an *application* for an absentee ballot, it is wholly irrelevant whether the completed ballot *itself* was returned to the Circuit Clerk's office to be counted. This argument also is without merit.

¶41. The evidence in the case *sub judice*, which evidence McFarland does not dispute on appeal,

showed that the signature on Cassie Neyland's application for an absentee ballot was not that of Cassie Neyland, but was instead written by Calvin McFarland. We find that the evidence was sufficient to support a conviction on Count III.

## IX. WHETHER THE EVIDENCE SUPPORTED A CONVICTION ON COUNT I.

¶42. Count I, of which McFarland was found guilty, charged him with falsely signing the name "Lottie James" to the affidavit on the envelope containing the absentee ballot marked by Lottie James. The count also charged McFarland with signing the ballot envelope's "Attesting Witness Certificate," which falsely signified that the true signature of Lottie James had been placed on the envelope. McFarland, in an argument identical to the first one in the previous assignment, contends that the evidence was insufficient for a conviction on this count because there was no evidence that he was not authorized to sign Lottie James' name to the affidavit on her ballot envelope, a proposition for which he again cites no authority. Again, we find that this argument must fail.

¶43. A person voting by absentee ballot must sign the affidavit on the ballot envelope as provided in Miss. Code Ann. § 23-15-635 (1972), which affidavit requires the signature of the *voter*. No statute provides that the voter may authorize another person to sign the voter's name to the affidavit.

¶44. McFarland does not dispute the sufficiency of the evidence showing that the signature on Lottie James' ballot envelope was not hers, and that it was McFarland who signed her name. Neither does McFarland dispute the fact that he signed the "Attesting Witness Certificate," thereby attesting that the signature on the ballot was the true signature of Lottie James. We find that the evidence was sufficient to support a conviction on Count I.

## X. WHETHER THE JURY INSTRUCTIONS WERE IMPROPER IN THAT THEY DID NOT FULLY INFORM THE JURY OF THE ELEMENTS OF THE CRIMES CHARGED.

¶45. Instruction S-1 instructed the jurors that in order to find McFarland quilty of Count I, they must find beyond a reasonable doubt that:

> [O]n or about October 7, 1991, the defendant did willfully and unlawfully swear falsely to the oath contained in the "Elector's Certificate" on the back of the ballot envelope by signing the name "Lottie James" thereto.

Instruction S-3 instructed the jurors that in order to find McFarland guilty of Count III, they must find beyond a reasonable doubt that:

> [O]n or about September 19, 1991, the defendant did willfully and unlawfully swear falsely to the oath contained in the "Application for Absent Elector's Ballot" by signing the name "Cassie L. Neyland" thereto.

McFarland argues that these instructions improperly failed to require the jury to find the requisite level of intent to commit vote fraud, and that they incorrectly invited the jury to find that the mere act of signing another person's name to that person's ballot envelope or application for an absentee ballot constituted the unlawful conduct punishable as vote fraud. We find this assignment to be without merit.

¶46. McFarland argues that the mere act of signing another's name to an absentee ballot is not criminalized in all circumstances, for which he cites Miss. Code Ann. § 23-15-549 (1972), which allows assistance to voters who require assistance by reason of blindness, disability or inability to read or write. This statute, however, applies only at the election polls, for it applies to those voters who declare there disability "to the managers of the election." *Id*. There is no statute authorizing such assistance to absentee voters, and for good reason.

¶47. At the polls on election day, the voting process is conducted in public view. There are poll managers, candidate representatives, party representatives and members of the general public on hand to witness the events and to ensure the integrity of the election process. When a voter receives assistance in this setting, the public nature of the process is designed to ensure that the voter's will is not overcome and the statutory requirements are met. These safeguards are not available, however, during the absentee voting process.

¶48. When the Legislature provided for absentee ballots to be voted by mail, it established other safeguards to maintain the integrity of the election process, which safeguards are intended to provide the absentee process with a comparable level of protection as exists at the polls. The purpose is to ensure that the elector himself marks his ballot free from any interference or improper influence. The mandatory provisions of Section 23-15-635 require, among other things, that the absent elector vote his ballot in the presence of a witness, place the ballot in the envelope, seal the envelope and sign the elector's certificate across the flap. The voter and the witness then swear, in the language provided by the statute, that this process was followed. The oaths of the voter and the witness are the only devices that ensure the integrity of this process. Accordingly, by way of Section 23-15-753, the Legislature has made it a crime, known as vote fraud, to violate the statutory provisions applicable to absentee voting. Vote fraud, therefore, is a *malum prohibitum* offense.

¶49. We stated in ***Wright v. State***, 236 So. 2d 408, 413-14 (Miss. 1970):

> Although it may be said that intent is a necessary element of all crimes, this does not necessarily connote conscious wrongdoing. There are statutory crimes in which the law categorically forbids certain acts without regard to the state of the mind of the actor. In that instance " . . . the intent to do that act is the only element necessary to complete the offense." 21 Am. Jur. 2d *Criminal Law* § 81 (1965). The Legislature may define a crime which depends on no mental element and consists only of forbidden acts or omissions. 14 Am. Jur. 2d *Criminal Law* § 16 (1938). Where acts constituting such an offense have been defined by the Legislature, criminal intent need not be proven by the prosecution.

¶50. Miss. Code Ann. § 23-15-753 (Supp. 1996) provides that "any person who shall willfully swear falsely to any affidavit provided for in Sections 23-15-621 through 23-15-735, shall be guilty of the crime of 'vote fraud.'" In this statute, the Legislature has defined a crime which requires no showing of actual criminal intent. Rather, the mere willful doing of the forbidden act itself constitutes the crime of vote fraud. We find that the jury instructions in the case *sub judice* fully and fairly instructed the jury of the elements of the crimes charged.

## XI. WHETHER THE TRIAL JUDGE SHOULD HAVE RECUSED HIMSELF FROM SITTING IN THIS TRIAL.

¶51. McFarland argues that the trial judge erred in failing to recuse himself from sitting in this trial, contending that because the judge was an elected official from Wilkinson County, "he may have had an interest in the outcome as he had to run for office in the future from that district." McFarland points to the judge's voir dire comments complained of in Issue IV, presumably either the judge's two instances of asking a leading question or his comment, "Don't make it a habit," made in response to defense counsel's request to approach the bench. McFarland also complains of the following comment made by the judge to defense counsel during the sentencing proceeding:

> I didn't quite understand your remarks as to whether it pointed at the Court or whether it pointed at the jury; you made some remarks in the record in the matter about the future. I don't think you intend to stand up to this Court and threaten this Court; did you?

Although McFarland did not request a recusal either before or during the trial, he points out that Canon 3(C)(1) of the Code of Judicial Conduct "enjoys the status of law such that we enforce it rigorously, notwithstanding the lack of a litigant's specific demand." **Green v. State**, 631 So. 2d 167, 177 (Miss. 1994) (quoting **Collins v. Dixie Transport, Inc.**, 543 So. 2d 160, 166 (Miss. 1989)).

¶52. Canon 3(C)(1) requires the disqualification of a judge when "his impartiality might reasonably be questioned, including but not limited to instances where: (a) he has a personal bias or prejudice concerning a party . . . ." We review the determination of whether a judge should have disqualified himself under an objective standard. "A judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality. **Green**, 631 So. 2d at 177 (quoting **Jenkins v. State**, 570 So. 2d 1191, 1192 (Miss. 1990)). A presumption exists that the judge, sworn to administer impartial justice, is qualified and unbiased, and where the judge is not disqualified under the constitutional or statutory provisions, "the propriety of his or her sitting is a question to be decided by the judge and is subject to review only in case of manifest abuse of discretion." **Green**, 631 So. 2d at 177 (quoting **Ruffin v. State**, 481 So. 2d 312, 317 (Miss. 1985)).

¶53. The mere fact that a trial judge hears a case, even an election case, in a county where the judge may sometime in the future run for reelection, does not alone give rise to a reasonable doubt as to his impartiality. McFarland has cited no instances where the trial judge improperly admitted or excluded evidence as a result of his alleged bias. As for the judge's comments, "[a]n occasional display of irritation, usually regretted as soon as made, does not suffice to show personal bias or prejudice, whether the irritation was justified or not." **Middleton v. Evers**, 515 So. 2d 940, 942 (Miss. 1987). We find that a reasonable person, knowing all of the circumstances, would not doubt the judge's impartiality in this case. As no motion for recusal was before the judge, his failure to recuse himself *sua sponte* was not a manifest abuse of discretion. Finding no merit among McFarland's assignments of error, we affirm the circuit court judgment below.

¶54. **COUNT I: CONVICTION OF VOTE FRAUD AND SENTENCE OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND PAYMENT OF A $1,000.00 FINE AFFIRMED. COUNT III: CONVICTION OF VOTE FRAUD AND SENTENCE OF FIVE (5) YEARS WHICH IS SUSPENDED AND PAYMENT OF A $1,000.00 FINE AFFIRMED. SENTENCE IN COUNT III SHALL RUN CONCURRENTLY WITH SENTENCE IN COUNT I.**

**PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, ROBERTS AND SMITH, JJ., CONCUR. LEE, C.J., CONCURS IN RESULT ONLY. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

#### McRAE, JUSTICE, DISSENTING:

¶55. In this case, the reason given by the defense for exercising a peremptory challenge on juror Janet McCarstle was race-neutral. The juror had significant exposure to the media surrounding the nature of the case and followed the case closely. The trial court erred in finding that the defendant gave a pretextual explanation for exercising the peremptory challenge and erred in reinstating McCarstle. Because the majority disagrees, I dissent.

¶56. The Supreme Court set forth a three-step process for determining whether a party has improperly utilized peremptory challenges for the purpose of racially discriminating against potential jurors in violation of the Equal Protection Clause. *Batson v. Kentucky*, 476 U.S. 79, 96-98 (1986). The party objecting to the peremptory challenge must first make a prima facie showing that race was the criteria for the exercise of the peremptory challenge. *Id.* at 96-97. If this initial showing is successful, the party desiring to exercise the challenge has the burden to offer a race-neutral explanation for striking the potential juror. *Id.* at 97-98. The trial court must then determine whether the objecting party has met its burden to prove there has been purposeful discrimination in the exercise of the peremptory. *Id.* at 98; *Georgia v. McCollum*, 505 U.S. 42, 58-59 (1992); *Stewart v. State*, 662 So. 2d 552, 557 (Miss. 1995); *Griffin v. State*, 610 So.2d 354, 356 (Miss.1992).

¶57. Given the requirement that the prosecution must make the same prima facie showing required of the defendant when he or she complains of discrimination, the defendant must articulate a racially neutral explanation only "if the State demonstrates a prima facie case of racial discrimination by the defendants." *McCollum*, 505 U.S. at 59. Here, the State claimed that McFarland had a pattern of striking white jurors, the defendant argued in rebuttal that McCarstle had been influenced by prior exposure to news of the challenge to the election, and the State responded that all the jurors on the venire had been exposed similarly. The trial court then decided that McFarland's reason for striking McCarstle was pretextual.

¶58. Nonetheless, even if a "pattern" could be said to exist, that fact alone is not dispositive. Trial courts must look to the totality of the circumstances, including the final make-up of the jury and the questions asked by the striking party. As *Batson* itself makes clear, the proof of a prima facie case is necessarily fact-intensive.

> To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Batson*, 476 U.S. at 96 (citations omitted). Similarly, it is important that the State come forward with facts, not just numbers alone, when asking the trial court to find a prima facie case. Since there was scant evidence from which the trial court could logically infer a discriminatory intent, the State failed to prove intentional discrimination here, particularly in the absence of circumstances suggesting juror bias, judge insensitivity, or improper motive by the defense counsel. It is for these reasons that I dissent.

### BANKS, JUSTICE, DISSENTING TO THE DENIAL OF MOTION FOR REHEARING:

¶59. I would grant the motion for rehearing. On reflection, while I do not agree with Justice McRae that no prima facie case was made f or a *Batson* challenge, I do agree that the reason proffered by the defense was race neutral and not pretextual within our jurisprudence.

¶60. McFarland proffered as the basis for his strike the fact that this particular juror, unlike others, had answered positively to every aspect of pretrial publicity involved in the case. The court's observation that all jurors had been exposed to pre-trial publicity is not responsive to the proffer in terms of the nature and degree of publicity to which this particular juror had been exposed and the amount that he recalled. Moreover, the record indicates that the observation was incorrect. Defense counsel identified five veniremen who indicated no exposure to pre-trial publicity before he was cut off by the court with the words, "[a]ll right, we're not going into any more detail."

¶61. We review the trial court's findings on *Batson* issues on a clearly erroneous standard. Where the trial court precludes a full record and expresses a less than complete refutation of the challenger's reasons, however, we should find that the action is indeed clearly erroneous. This is especially so where we are dealing with defense challenges. While the conflict between the constitutional right of a defendant to a fair and impartial jury and that of prospective jurors to be free of invidious racial discrimination has been struck in favor of the latter, we must not be unmindful of the fact that the conflict remains. *See Georgia v. McCollum,* 505 U. S. 42, 62, 68-70 (1992) (Thomas, J., concurring, O'Connor and Scalia, JJ., dissenting).

1. This rule is currently contained in Mississippi Uniform Circuit and County Court Rule 3.05.