# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-DP-00738-SCT

*CURTIS GIOVANNI FLOWERS*

*v.*

*STATE OF MISSISSIPPI*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 02/12/2004 |
| TRIAL JUDGE: | HON. C. E. MORGAN, III |
| COURT FROM WHICH APPEALED: | MONTGOMERY COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DAVID PAUL VOISIN ANDRE DE GRUY |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JUDY T. MARTIN MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | REVERSED AND REMANDED - 02/01/2007 |
| MOTION FOR REHEARING FILED: | 07/13/2006 |
| MANDATE ISSUED: | |

**EN BANC.**

**GRAVES, JUSTICE, FOR THE COURT:**

¶1. The motion for rehearing is denied. The original opinions are withdrawn, and these opinions are substituted therefor.

¶2. A Montgomery County grand jury issued four separate indictments for capital murder against Curtis Giovanni Flowers for the killing of four people during the commission of a

robbery. He was tried and convicted on one count after a change of venue from Montgomery County to Lee County. We reversed that conviction on appeal. *See Flowers v. State*, 773 So. 2d 309 (Miss. 2000) ("*Flowers I*"). Before *Flowers I* was handed down, Flowers was tried and convicted on another count in Harrison County. We also reversed that conviction. *See Flowers v. State*, 842 So. 2d 531 (Miss. 2003) ("*Flowers II*"). Flowers was then tried and convicted on all four counts in Montgomery County and sentenced to death the following day. Flowers now appeals his conviction and sentence of death.

**FACTS**

¶3. On July 16, 1996, Bertha Tardy called Sam Jones, one of her employees at Tardy Furniture Store, and asked him to come down to the store to train two new employees, Robert Golden and Derrick "Bobo" Stewart, on loading furniture and making deliveries. When Jones arrived at the furniture store between 9:15 and 9:30 a.m., he discovered that Tardy, Golden, Stewart, and Carmen Rigby had all been shot and only Stewart was still alive at that time. Jones went to a nearby business and requested that someone call the police and an ambulance. Chief Johnny Hargrove was the first police officer to arrive at the crime scene, and he and Jones went back inside the store. MedStat employees then arrived and took Stewart to the hospital, where he died days later.

¶4. Investigating officers determined that all of the victims had been shot in the head and recovered .380 calibre shell casings from the crime scene. Bloody footprints were also found near the body of one of the victims. Officers also found a check payable to Curtis Flowers and a time sheet of his hours worked in the office at Tardy's Furniture. Doyle Simpson

2

reported that his .380 calibre pistol had been stolen from his car that morning, and a witness placed Flowers at Simpson's car earlier that morning. Flowers was interviewed by police that same day, and they conducted a gunshot residue test on him; however, he was not detained at that time. After further investigation, Flowers was arrested and indicted on four separate counts for the murders of Tardy, Golden, Stewart, and Rigby.

¶5. Flowers was initially tried, convicted, and sentenced to death for the murder of Bertha Tardy on October 17, 1997. He was also tried, convicted, and sentenced to death in a separate trial for the murder of Derrick Stewart on March 31, 1999. This court reversed both convictions on appeal. *See Flowers I* and *II*. After Flowers' separate convictions for the deaths of Tardy and Stewart were overturned, all four cases were consolidated and brought to trial in Montgomery County on February 2, 2004.

¶6. An initial jury pool consisting of 500 citizens was drawn, with 300 scheduled to appear on the first day of trial, a Monday, and the remaining 200 instructed to report to the courthouse on Wednesday. When the judge realized he may not have enough qualified jurors to empanel a jury from the initial venire, he entered an order for the clerk to draw the names of 100 more potential jurors. The voir dire process consisted of both group and individual examination. When the parties began exercising their peremptory strikes, the State exercised its first seven on African-American jurors. At this point, defense counsel lodged a *Batson*[1] challenge, contending that the strikes were racially motivated. The judge declared that

---

[1] *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. 2d 69 (1986).

Flowers had shown a prima facie case of discrimination under **Batson** and required the State to proffer race-neutral reasons for the exercise of peremptory strikes, which Flowers then rebutted. The State also exercised its remaining five peremptory challenges of potential jurors on African-Americans. After the State had exercised all of its peremptory challenges, two African-American jurors were seated; however, one of those two was later excused after he informed the judge that he could not be a fair and impartial juror. The State then exercised all three of its strikes of alternate jurors on African-Americans. At the end of the jury selection process, the trial court ruled that the State had not exercised its peremptory challenges in a racially discriminatory manner and denied Flowers' **Batson** challenge.

¶7. Opening statements began on February 6th, after four days of jury selection. After six days of testimony, the jury received the case on February 11th and returned a unanimous guilty verdict on all four counts of murder. The sentencing phase of the trial was held the next day, and the jury unanimously decided that Flowers should receive the death penalty for each conviction. Flowers filed a motion for a new trial; the trial court held a hearing on Flowers' motion; and the motion was ultimately denied. Flowers timely filed his notice of appeal on April 6, 2004. Flowers now raises eighteen issues on appeal. We find the first issue dispositive of the case and reverse and remand for a new trial.


**DISCUSSION**


4

## I.

¶8.    Flowers claims that the trial court erred in denying his *Batson* claim below because the State exercised its peremptory strikes in a racially discriminatory way when it used all fifteen peremptory strikes on African-American jurors.  The State rebuts this charge by claiming that it offered sufficient race-neutral reasons for its challenges and that Flowers failed to introduce sufficient evidence to prove that the strikes were a pretext for racial discrimination against African-American jurors.  This Court gives great deference to a trial court's determinations under *Batson* because they are based largely on credibility.  *Berry v. State*, 802 So. 2d 1033, 1037 (Miss. 2001) (citations omitted).  In reviewing a claim for a *Batson* violation, "we will not overrule a trial court on a *Batson* ruling unless the record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence."  *Thorson v. State*, 721 So. 2d 590, 593 (Miss. 1998).

¶9.    In lodging a *Batson* claim, the party who objects to the peremptory strike "must first make a prima facie showing that race was the criteria for the exercise of the peremptory strike."  *McFarland v. State*, 707 So. 2d 166, 171 (Miss. 1997) (citing *Batson*, 476 U.S. at 96-97).  A defendant can establish a prima facie case of discrimination by showing:

> (1) that he is a member of cognizable racial group; (2) that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race; (3) and the facts and circumstances raised an inference that the prosecutor used his peremptory challenges for the purpose of striking minorities.

*Snow v. State*, 800 So. 2d 472, 478 (Miss. 2001).  Once a prima facie case has been established, the party exercising the challenge has the burden to articulate a race-neutral

explanation for excluding that potential juror. *McFarland*, 707 So. 2d at 171. As long as discriminatory intent is not inherent in the explanation given by the prosecution, "the reason offered will be deemed race neutral." *Randall v. State*, 716 So. 2d 584, 588 (Miss. 1998) (citation omitted). After a race-neutral explanation has been given, "the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory," i.e., that the reason given was a pretext for discrimination. *McFarland*, 707 So. 2d at 171. This Court has recognized five indicia of pretext that are relevant when analyzing the race-neutral reasons offered by the proponent of a peremptory strike, specifically:

> (1) disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge; (2) the failure to voir dire as to the characteristic cited; . . . (3) the characteristic cited is unrelated to the facts of the case; (4) lack of record support for the stated reason; and (5) group-based traits.

*Manning v. State*, 765 So. 2d 516, 519 (Miss. 2000) (citations omitted). The burden remains on the opponent of the strike to show that the race-neutral explanation given is merely a pretext for racial discrimination. *Berry*, 802 So. 2d at 1042.

¶10. During the initial stage of jury selection, the State exercised all twelve of its peremptory strikes against African-American jurors. Two African-Americans were initially seated on the jury after the State ran out of peremptory strikes. Stanley Booker, an African-American male who was initially selected to serve on the jury, was released from service after he came forward and admitted to the judge that he could not be fair and impartial. After Mr. Booker was released, the judge provided for the picking of alternate jurors, and the State

6

exercised all three of its available peremptory strikes of alternates against African-American jurors. Only one African-American, Lashanda McChristion, ultimately sat on the jury that convicted Flowers. Though the State exercised all fifteen of its peremptory strikes against African-American jurors, Flowers only contests the striking of eleven of those fifteen jurors on appeal.[2] We now address Flowers' challenge of those eleven jurors.

## II.

*Juror 4 - Willie Lee Hamer, Jr.*

¶11.    Flowers first challenges the striking of juror Willie Lee Hamer, Jr., an African-American male. When asked the reasons for the peremptory strike, counsel for the State noted that:

> To start with, he already has formed an opinion on this particular case. He is friends with the sister of the Defendant, Priscilla. He knows the Defendant. He knows his whole family, and he said he was against the death penalty. He ended up being rehabilitated and saying he could consider it, but he said he did not believe in the death penalty and to start with, said that he couldn't give it under any circumstance.

The judge found the proffered reasons of the State to be race neutral and asked Flowers' counsel for rebuttal. After initially stating that he had no rebuttal, defense counsel, moments later, rebutted the State's explanation for striking Hamer with the following account:

> Both Elsie Holifield and Debbie Collins, who are white females, jurors number 15 and 16, expressed even stronger reservations about the death penalty and were both rehabilitated, and the State accepted them. I think the fact that they are accepting those two white ladies and striking Mr. Hamer for allegedly the

---

[2] Flowers does not contest the striking of jurors Lester Sawyer, James Forrest, Iresha Young, and Bernice McMillian.

same reason indicates that that is not a real reason, and therefore Mr. Hamer should be placed on the jury.

The record reflects, via Hamer's individual voir dire, that he had "somewhat" formed an opinion of the case, he knew Flowers from the streets, he was friends with Flowers' sister Priscilla for roughly ten or more years (yet he also stated he knew her "just by meeting in the street"), he had been arrested twice on domestic violence charges, and he did not personally believe in the death penalty; however, he later indicated that he could consider both the death penalty and a life sentence at the penalty phase of trial. The judge ultimately ruled that "the totality of the circumstances make the strike race neutral."

¶12. The State contends that the trial court should not be held in error where, as here, the party opposing the peremptory challenge has not rebutted all of the race-neutral reasons given. *See Thorson*, 721 So. 2d at 593 ("If the defendant fails to rebut, the trial judge must base his decision on the reasons given by the State."); *Woodward v. State*, 726 So. 2d 524, 534 (Miss. 1997) (finding that trial judge did not err in basing ruling only on State's proffered reasons when defendant did not rebut all race-neutral reasons given by State). At trial, defense counsel did rebut the State's explanation that Hamer opposed the death penalty by arguing that the State accepted two white jurors Holifield and Collins who were opposed to, or equivocal about, the death penalty; however, defense counsel did not attempt to rebut the other race-neutral reasons.

¶13. If the State's opposition to Hamer as a juror were based solely on his responses concerning the death penalty and its application, then Flowers may have a legitimate

argument that the strike was pretextual, yet the State did offer several additional race-neutral reasons which Flowers failed to rebut. That a juror has formed an opinion about the case prior to trial has been held as a valid race-neutral reason for striking a potential juror, *see Ryals v. State*, 794 So. 2d 161, 166 (Miss. 2001), as has the juror's acquaintances with a defendant and his/her family. *Perry v. State*, 637 So. 2d 871, 873-74 (Miss. 1994) (knowing a defendant deemed a race-neutral reason). Additionally, a juror's prior criminal activity has been upheld as a valid race-neutral reason for exercising a peremptory challenge. *Lynch v. State*, 877 So. 2d 1254, 1271-72 (Miss. 2004). Because the State offered several valid race-neutral reasons for striking Hamer which went unrebutted by Flowers at trial, we find that the trial court did not err in ruling that, under the totality of the circumstances, the striking of Hamer was race-neutral.

*Juror 8 - Sharon Golden*

¶14. Flowers next challenges the peremptory strike exercised on Sharon Golden, an African-American female. When counsel for the State was asked to justify the strike, he stated that "Ms. Golden was one of the ones that said at one point under no circumstance could she consider the death penalty, that it was against her religion. And she was barely in my opinion rehabilitated but enough to where she said that she could consider it." Flowers' counsel rebutted the State by arguing that Golden had views on the death penalty similar to white jurors Collins and Holifield, whom the State accepted, and that the real reason for the striking of Golden was her race. The trial judge, however, found that the State's proffered reason was race-neutral and met the requirements of *Batson*.

9

¶15. The record reflects that although Golden marked on her jury questionnaire that she had no personal or religious beliefs that would prohibit her from imposing the death penalty, in both group and individual voir dire she indicated that she had religious beliefs that would keep her from voting for the death penalty. In fact, counsel for the State asked whether she could vote for the death penalty in any case and she said no. When asked by Flowers' counsel whether she could consider the death penalty, Golden stated "I guess I could consider it." Golden again said she would "consider" the death penalty as an option, before ultimately saying she could vote for the death penalty.

¶16. In order to determine whether there is any merit to Flowers' claim that Golden was excluded while white jurors with similar views on the death penalty were accepted, we compare the examination of jurors Collins and Holifield to that of Golden. Similar to Golden, both Holifield and Collins indicated during group voir dire that they could not impose the death penalty, even if the facts warranted it.

¶17. During individual voir dire, Holifield responded to the judge's question regarding whether she had religious or philosophical opposition to the death penalty by saying that "I don't know that I could be the one that said someone should die for something, but I have no religious beliefs against it." When asked by the judge whether she would consider both life in prison or the death penalty, Holifield responded, "I would not automatically vote for the death penalty." When counsel for the State began to question Holifield, the following exchange took place:

Q. My concern and what I need to ask you now is are your beliefs such about the death penalty that you yourself could not vote for the death penalty regardless of what the Judge told you the law was or what the facts of the case were?

A. I don't know that I could. That's the reason I stood up before. I don't know that I could say that someone deserved the death penalty.

Q. Okay, and based on that, if you were picked as a juror and got to the second phase, would your view be that you would just have to automatically vote for life because you yourself couldn't vote for the death penalty?

A. I wouldn't say it would be automatic. It would depend upon all the circumstances, but it would be very difficult to say the death penalty. It really would.

. . .

Q. Authorized. If the judge instructed you that it was authorized in this case and the facts of the case justified it, could you yourself vote for the death penalty?

A. I guess I could.

¶18. In comparing the responses of Golden and Holifield, these two jurors did express similar views on the death penalty, though there are some subtle differences in their responses. Golden stated in both group and individual voir dire that she had religious beliefs that were opposed to the death penalty. In group voir dire, Holifield did not express a religious belief that would keep her from applying the death penalty but rather indicated she could not follow the judge's instructions regarding the death penalty. During individual voir dire, Golden initially indicated she could never vote for the death penalty, then said she "guessed" she could consider it, she "could" consider it, and eventually that she "could vote" for the death penalty. During individual voir dire, Holifield never explicitly stated that she could never vote for the death penalty but rather expressed a great deal of apprehension about saying that someone deserved to die. She did ultimately say "I guess I could" apply the death penalty if it was authorized.

11

¶19. Regarding Golden and Collins, they both initially stated their opposition to the death penalty. While Golden did not express personal or religious opposition to the death penalty on her questionnaire, Collins wrote "YES!!" on her questionnaire in response to the question asking jurors whether they had a personal or religious belief against imposing the death penalty. In group voir dire, both Collins and Golden indicated that they could not impose the death penalty. In individual voir dire, Collins stated that she had formed an opinion as to guilt or innocence, though she did not state what that opinion was. She initially indicated that she would never render a death verdict. Later, when counsel for the State asked if she could vote for the death penalty if the law authorized it and the facts justified it, Collins responded that after much thought "since we started yesterday, I think I could answer honestly now that yes, I could." Collins, like Golden, initially stated she could not apply the death penalty at all, yet she, like Golden, ultimately stated she could vote for it.

¶20. The State did offer a valid race-neutral reason for striking Golden, her opposition to the death penalty, which Flowers rebutted by noting Holifield's and Collins' similar reticence about the death penalty. Though Flowers rebutted the race-neutral reason given by the State, the trial judge found that the requirements of **Batson** had been met, and that Flowers' claim of discriminatory intent was ultimately without merit.

¶21. After examining the responses of these three jurors side by side, there does not appear to be any great difference, on paper, between the three of them. What does not show up in this examination are the physical mannerisms, vocal inflection, or demeanor of the witnesses which may cause an attorney to feel that one similarly situated juror is more acceptable than

12

another. Because the record does not provide us with these intangible factors, one could easily infer that race played into the striking of Golden, based on the fact that two white jurors with similar expressions on the death penalty were found acceptable to the prosecution. *See Miller-El v. Dretke*, 545 U.S. 231, 252, 125 S.Ct. 2317, 2332, 162 L.Ed. 2d 196 (2005) ("Comparing his strike with the treatment of panel members who expressed similar views supports a conclusion that race was significant in determining who was challenged and who was not."). However, the trial court, who had the benefit of actually observing the witnesses and their responses, found that Flowers did not meet his burden in finding that the peremptory strike of Golden was a pretext for racial discrimination.

¶22. Though the record shows no measurable difference between the views of Golden and the similarly-situated white jurors Holifield and Collins, we find that the trial judge's determination was not clearly erroneous or against the overwhelming weight of the evidence introduced during voir dire, so as to warrant a reversal. *See Walker v. State*, 815 So. 2d 1209, 1214 (Miss. 2002) ("we will not overrule a trial court on a *Batson* ruling unless the record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence."). While this strike, standing alone, may not warrant the finding of a *Batson* violation, the continuous striking of African-American jurors, whose views on the death penalty are virtually indistinguishable from those of similarly situated white jurors who went unchallenged by the State, does raise an inference of racial discrimination. As we have stated previously, disparate treatment of similarly situated jurors is an indicator of pretext for racial discrimination. *See Manning*, 765 So. 2d at 519.

13

*Juror 12 - Marquis Kendle*

¶23.  Flowers contends that the striking of Marquis Kendle was a pretext for discrimination because the main reason given for the strike, that Kendle knew the defendant and various family members, was not used by the State to strike white jurors who also knew Flowers and his family.  The State contends that this claim is procedurally barred because Flowers failed to rebut the State's proffered reasons for striking Kendle at trial.[3]  We agree with the State that Flowers should be procedurally barred from challenging the peremptory challenge to Kendle, as the trial court was not afforded the opportunity to rule on the issues that Flowers now attempts to raise on appeal.  *See **Evans v. State***, 725 So. 2d 613, 632 (Miss. 1997) (issues not presented to trial court are procedurally barred, and any error is waived, and this bar applies in capital cases).  Despite our application of a procedural bar, we now address the merits of Flowers' claim.

¶24.  Flowers contends that Kendle received disparate treatment from white jurors who admitted knowing either Flowers or members of his family, yet he fails to support this claim by actually showing discrepancies in the responses of Kendle and white jurors who were supposedly similarly situated, relying instead on mere allegations.  The record reflects that Kendle knew Flowers since he was five or six years old, had grown up around him, knew

---

[3]  The only argument offered by Flowers' counsel at trial concerning Kendle was that there was no evidence in the record concerning the State's contention that Kendle had legal problems, which the State then verified by introducing a bench warrant that had been issued for Kendle. Flowers' counsel offered no objection to the introduction of the warrant and no rebuttal to the striking of Kendle.

14

several members of his immediate family, and was "pretty good friends" with some of Flowers' relatives. Of all of the white jurors who were not struck for cause (and either served on the jury or were struck peremptorily), six admitted knowing either Flowers or one of his family members. Of these six, four jurors admitted knowing Flowers' father and/or mother in passing. These were jurors Bane, H.R. Collins, Austin, and Blaylock. Juror Phillip Cross, a reserve deputy in Montgomery County, stated he "knew of" Flowers and had been a classmate of his sister, Priscilla. Judy Dees stated that she knew Flowers' face but did not know him personally, that she knew his sisters Angela and Cora, and knew his father because he worked for Wal-Mart.

¶25. After the State struck Kendle, counsel was required to offer a race-neutral reason. Counsel responded with the following:

> To start with, he has problems with law enforcement officers. I have talked to numerous officers that they have had pretty verbal run-ins with about his resentment with the law. He has an outstanding warrant right now for contempt of court in Grenada which shows his disregard for the system in totality. He knows the Defendant. He knows the Defendant's mother. He knows the Defendant's sister. He knows the Defendant's brother. He knows the Defendant's uncle, and anybody that has that many connections with the Defendant and his family, we do not want on the jury.

¶26. Knowing the defendant has been held a valid race-neutral reason for striking a juror, *see* **Perry**, 637 So. 2d at 873-74, as well as being acquainted with a defendant's family, *see* **Manning v. State**, 735 So. 2d 323, 340 (Miss. 1999). While it is true that some of the white jurors who ultimately sat on the jury did know Flowers and/or members of his family, a review of the record reflects that the connections that Kendle had with Flowers and his

15

family were more substantial than any of the white jurors referenced above. As Flowers did not rebut this race-neutral reason at trial, we decline to hold the trial court in error for accepting the reason offered by the State. *See Berry*, 802 So. 2d at 1037 ("If the defendant fails to rebut, the trial judge must base his decision on the reasons given by the State.").

¶27. On appeal, Flowers glosses over the fact that the State also challenged Kendle on the ground that he had an outstanding warrant for criminal contempt and attempts to minimize this fact with Kendle's contentions that he was unaware of the warrant and could clear up the matter with payment of a fine. Regardless of the reason the bench warrant was issued or Kendle's knowledge of it, the fact remains that one was outstanding for Kendle at the time of this trial, and a juror's criminal history has been held to be a valid race-neutral reason for exercising a peremptory strike. *See Lynch*, 877 So. 2d at 1271-72.

¶28. When looking at the totality of the circumstances for the State's strike of Kendle, we find that the trial court did not err in failing to find this strike pretextual. The State offered two valid race-neutral reasons, Kendle's extensive connections with the Flowers family and his legal problems. Flowers failed to rebut these reasons at trial so the trial court should not be held in error for relying on the State's proffered reasons. Whether or not Flowers rebutted the reasons given by the State below, those proffered reasons are supported in the record; therefore, the trial court's decision was not against the overwhelming weight of the evidence. *See Walker*, 815 So. 2d at 1214 (trial court's *Batson* ruling sustained unless clearly erroneous or against overwhelming weight of evidence).

*Juror 13 - Vickie D. Curry*

16

¶29. The State struck juror Curry for the following stated reasons:

> Ms. Curry works with the Defendant's sister, Alicia, and she has problems with the death penalty also. Other reasons: One of my investigators, John Johnson, personally had run-ins with her husband and convicted him of burglary of a nursing home when he was with the police department and sent him to the penitentiary. But the main reason is going to be connections with the Defendant's family.

Counsel for the State also responded to a question concerning Curry's work relationship with Flowers' sister by stating:

> I just put down that she worked with her, and I don't want to leave anybody on that has ever worked with any of the family if I can keep from it because everybody that has answered has been influenced by this family one way or the other. And most of them have opinions that know the family. For that reason, I don't want to leave anybody on that has working relationships or friendships with the family. But she also, besides that, the death penalty question. The death penalty on her, she was one of the ones that did not even respond to the Court's questioning, but when she got on the stand, she said she could not vote for the death penalty, and then she was rehabilitated.

Flowers claims that the reasons given were a pretext for racial discrimination, as Curry's relationship with members of Flowers' family were minimal at best, Curry never expressed any opposition to the death penalty, and the claim that Curry's husband had problems with the law was unsubstantiated.

¶30. The first reason given by the State, that Curry had previously worked with Flowers' sister, is a valid race-neutral reason. See *Manning*, 735 So. 2d at 340 (condoning peremptory challenge of juror acquainted with defendant's family). The State contends that Flowers did not rebut this reason and is procedurally barred from challenging it on appeal. The record reflects that counsel for the State originally stated "Ms. Curry works with the Defendant's

17

sister," tending to indicate a present relationship. Flowers' counsel responded that "the record would reflect that she worked with Felicia ten years ago," indicating that the State's reason was not factually accurate and thus an indication of pretext. We find that the reply of Flowers' counsel was sufficient to preserve the issue for appeal.

¶31. The record reflects that Curry indicated that she had worked with Flowers' sister roughly ten years prior and stated that "[w]e worked at the same hospital, not together." She stated that she worked with Flowers' sister for "maybe a year" and that she no longer sees his sister now that the two do not work for the same employer. Bane, a white juror, was not struck by the State despite the fact that her husband was a manager at the Wal-Mart where Flowers' father worked. Admittedly, there is a factual difference between a juror who works with a member of a defendant's family and a juror whose husband works with a member of a defendant's family. That being said, we find it incongruous that the State would strike Curry, but not Bane, unless race was a significant factor because Curry has had no contact with the defendant's sister since they were employed at the same business roughly a decade ago, while Bane's husband currently works with Flowers' father, and she is much more likely to have current and future contact with Flowers' father. The questionable nature of the State's reasoning is magnified by the prosecutor's comment that "I don't want to leave anybody on that has working relationships or friendships with the family."(Emphasis added.)

¶32. The reason proffered by the State was that Curry had problems with the death penalty, as counsel for the State actually stated that "[s]he said she couldn't vote for the death penalty." Flowers' counsel rebutted this race-neutral reason by claiming that Curry's

18

opposition to the death penalty was not as strong as that of Holifield and Collins, white jurors accepted by the State. The record does not support this reason offered by the State, as nowhere in Curry's jury questionnaire, group voir dire, or individual voir dire did she ever state that she opposed the death penalty. In fact, she responded "yes" to the State's question of whether she could return a verdict of death if it was authorized and the facts justified the sentence. Lack of support in the record for the reason given for a peremptory strike has been identified as an indicator of pretext. *Manning*, 765 So. 2d at 519. Regardless of whether counsel's incorrect assertion resulted from an honest mistake or a discriminatory intent, there is no evidence in the record before us to indicate that Curry opposed the death penalty. Additionally, counsel's statements that Curry did not respond to questions posed by the court and that she said she could not vote for the death penalty appear to be outright fabrications; therefore, we find that this reason offered by the State was not the true reason Curry was struck and is indicative of a racially discriminatory intent. *See Miller-El*, 125 S.Ct. at 2332 ("[W]hen illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives.").

¶33.   The third and fourth reason given by the State for striking Curry was her husband's criminal conviction and his supposed problems with the law, which the prosecutor articulated by saying "[o]ne of my investigators, John Johnson, personally had run-ins with her husband and convicted him of burglary of a nursing home when he was with the police department and sent him to the penitentiary." Flowers' counsel rebutted this reason by noting that Bane, a white juror, had a family member who had been charged with a criminal offense yet the

19

State accepted her.[4] Curry did not answer the question on her jury questionnaire regarding whether any of her family members had been charged with a crime, nor did she respond during group voir dire when the trial court asked if any jurors had family members who had been charged with a felony. Also, counsel for the State never questioned Curry during individual voir dire about her husband's supposed criminal conviction. The only support for the State's claim that Curry's husband had been convicted of a crime is counsel's bare assertion that an investigator informed him of the conviction, and there is no evidentiary support in the record to support this claim. Lack of support in the record, as stated above, is an indicator of pretext. But see *Snow v. State*, 800 So. 2d 472,482 (Miss. 2001). Failure to voir dire as to the characteristic cited for the strike is also an indicator of pretext. *See Manning*, 765 So. 2d at 519. *See also Miller-El,* 125 S.Ct. at 2328 (failing to conduct meaningful voir dire on subject on which State is allegedly concerned suggests that "explanation is a sham and a pretext for discrimination.") (citation omitted); *Howell v. State*, 860 So. 2d 704, 766 (Miss. 2003) (Graves, J., dissenting).[5]

---

[4] Bane indicated that she had a nephew who had been charged with robbery in Tupelo several years earlier.

[5] The dissent in *Howell* reasoned that:
It is fundamentally unfair that the reasons proffered by the State were not brought up, discussed with or produced to defense counsel at any time prior to or during voir dire. Further, the matters were never raised during voir dire of jurors High and Wade. Neither High nor Wade was given an opportunity to respond to the truthfulness or accuracy of these allegations. This is exactly the type of information that should be revealed prior to voir dire because without it the defense is denied the opportunity to evaluate and test the veracity and accuracy of the information which the State used as the basis for its challenges. A review of the record reveals that jurors High and Wade were never asked any specific questions by the State regarding

¶34. The trial court upheld the State's strike of Curry as race-neutral "on the basis that she had worked with the other family member." This is a valid race-neutral reason and may ordinarily be sufficient to support a finding that the strike was not pretextual. However, when the main reason given for the strike, that Curry previously worked with Flowers' sister, is viewed in light of the fact that another white jury member, Banes who was not struck by the State, had as tenuous a relationship with Flowers or his family members as Curry, discrimination can be inferred. This inference of discrimination is heightened by the fact that another reason given for the strike, Curry's supposed opposition to the death penalty, is unsubstantiated by the record. The bald assertion that Curry's husband had a run-in with the D.A.'s investigator, who was then still a police officer, which resulted in a criminal conviction is also questioned by Flowers, but this Court, in *Snow,* discussed the prosecution's reliance on information supplied by the police, and concluded: "[w]e decline to set any limits on the prosecutor's use of any legitimate informational source heretofore or hereafter available as to jurors". *Id* at 482. Thus this bald assertion does not, in and of itself, necessitate finding that a *Batson* violation occurred. The judge's finding is more suspect in light of his following statement:

> The Court does recall that during all of this voir dire there have been many people who have had contact with the Defendant's family and many of them who have worked with them. Almost all of those have had some opinion based on that relationship. Some of them haven't, but some of them have. And **the State has a right to exercise a challenge based on some of the**

matters which were subsequently used as reasons to strike them.
*Howell*, 860 So. 2d at 766 (Graves, J., dissenting).

21

**answers from the other jurors as far as their peremptory challenge goes**. And therefore, I find that that is a race neutral reason.

(Emphasis added). By this statement, the trial court essentially said, without noting any authority for such a proposition, that the State can take the answers of other jurors and apply them to the instant juror to support the State's peremptory challenge. Such a proposition has no basis in law and, rather, runs counter to our jurisprudence, since ***Batson*** and its progeny are predicated on an idea that each juror must be evaluated on his/her own merits. Because two of the State's four grounds for striking Curry have no basis in the record, and Curry was treated disparately from a similarly situated white juror on the third ground, we are convinced that the trial court erred in denying Flowers' ***Batson*** challenge as to the striking of Curry, as this ruling is against the overwhelming weight of the evidence in the record.

*Juror 14 - Latoya Carodine Reed*

¶35.    The State's purported race-neutral reasons for striking Reed were stated as follows:

> [W]e have got several reasons. One is her belief against the death penalty. Another reason in there is that she worked at Multicraft, and several of the Defendant's family members from the record worked at Multicraft. So again, I don't want to leave anybody on there that has connections with the family, that has worked with the family, and had run-ins with the family.

Flowers' counsel rebutted the State's proffered reasons by arguing that the State had accepted two white jurors with views on the death penalty similar to Reed's. Flowers also challenged the State's second reason given, that Reed worked with members of Flowers' family, by noting that although Reed had worked at Multicraft in 2001, she stated that she did not know any member of the Flowers family and "didn't work with any of the Flowers

22

as far as she knew." The trial court found that the reasons given by the State for challenging

Reed were race-neutral.

¶36.    The record reflects that Reed was ambivalent in her responses concerning application

of the death penalty. She neither indicated on her jury questionnaire nor in group voir dire

that she had a problem with the death penalty, yet during individual voir dire, she stated "I

don't too much believe in the death penalty, but if that's what have to happen, then" and at

one point indicated that if she were faced with giving a life sentence or death sentence she

would automatically give a life sentence. Flowers' counsel rehabilitated her, and she

eventually stated that she could vote for the death penalty if it was warranted, even if it meant

setting aside her personal opinion on the death penalty.

¶37.    The reticence Reed expressed about voting for the death penalty was similar to that

expressed by both Holifield and Collins, discussed *supra* (re juror Golden). If Reed's

attitude on the death penalty was the only reason the State struck her, Flowers might have

a stronger argument that the peremptory challenge was pretextual. The State, however, also

struck Reed because she had previously worked at Multicraft, where members of Flowers'

family also worked.[6] While we express some doubts as to whether Reed actually had any

_____

[6] Reed indicated that although she worked at Multicraft, she did not know the names of three
family members mentioned by the State as possibly working at Multicraft and that she worked on
the late shift. When Flowers' counsel pointed out that Reed stated she did not know any of Flowers'
family, counsel for the State responded that "she did not tell the truth," apparently assuming that it
was not possible for Reed to work at the same location as these family members without knowing
them. While we find no basis for this assertion other than the fact that the prosecutor did not like
and/or accept the answer given by Reed, we have previously acknowledged that "a prosecutor's
distrust of a potential juror is a race-neutral reason for challenging the juror." *Lynch*, 877 So. 2d
at 1276.

connections with Flowers' family, the fact that she had previously worked at same business as members of Flowers' family provides the State with a sufficient ground for exercising a peremptory strike. We do find sufficient evidence in the record to support the trial court's finding that the peremptory strike of Reed was race-neutral.

¶38.    While we cannot say with certainty that the trial court's ruling as to this juror was clearly erroneous, the ruling is problematic. While the State's proffered reasons were race neutral, Reed's position on the death penalty was virtually indistinguishable from two white jurors whom the State did not strike, and even though Reed had worked at Multicraft two years previously, she no longer worked there at the time of trial and even stated that she knew none of Flowers' family members who supposedly worked at Multicraft. In light of these facts, the trial judge's wholesale acceptance of the State's proffered reasons is suspect, especially considering his prior statement that "the State has a right to exercise a challenge based on some of the answers from the other jurors as far as their peremptory challenge goes," a statement which seemingly ignores the dictates of ***Batson***. Thus, we conclude that because the trial court's findings under ***Batson*** are accorded great deference, even if some may be suspect, they do not rise to the point of being clearly erroneous.

*Juror 17 - Connie Pittman*

¶39.   The State's race-neutral reason for striking Pittman was "the main reason is that she said on the stand she didn't believe he did it.  And anybody that has an opinion at this point that they would say something like that, they cannot be fair and impartial, and I just don't want them on there," which the trial court found to be a sufficient reason for exercising a peremptory strike.  Though counsel for Flowers failed to rebut this proffered reason at trial, he now contends on appeal that the reason given at trial was a pretext for discrimination because Pittman never took the position that the State ascribed to her.  The State contends that Flowers should be procedurally barred from having this issue considered on appeal for the first time since the trial court was not given the opportunity to rule on the matter.  *See Evans*, 725 So. 2d at 632.

¶40.   Application of a procedural bar is warranted based on Flowers' counsel's failure to rebut the race-neutral reason proffered by the State.  Issues not presented to the trial judge are "procedurally barred and error, if any is waived.  This rule is not diminished in a capital case." *Manning v. State*, 735 So. 2d. 323, 339 (Miss. 1999). Procedural bar notwithstanding, we address the merits of this issue.  Because the error in upholding the strike of Pittman affects a substantial right, we apply the plain error rule to find that a *Batson* violation occurred.  *Williams v. State*, 794 So. 2d 181, 187 (Miss. 2001) (recognizing that plain error rule will be applied where defendant failed to make contemporaneous objection and defendant's substantive/fundamental rights are affected).

25

¶41. Flowers correctly contends that the State had no basis for its asserted reason for striking Pittman. The record reflects that when Pittman was questioned as to whether she had formed an opinion as to Flowers' guilt or innocence, she answered "No," indicated that she could be impartial, and that she would base her decision solely on the evidence presented in court. There is nothing in the record to support the State's contention that Pittman said she did not believe Flowers committed the crime or that Pittman had formed any opinion regarding the case. Lack of support in the record for the reason stated has been held by this court to be an indicator of pretext. *See Manning*, 765 So. 2d at 519.

¶42. Apart from arguing the procedural bar, the State also attempts to refute this allegation of racial discrimination by claiming that "the prosecutor's faulty or inaccurate recollection" of the facts was just "an honest mistake." In support of its position, the State cites to a Tenth Circuit case, *Hurd v. Pittsburg State University*, 109 F. 3d 1540, 1546-48 (10th Cir. 1997) (abrogated by *Migneault v. Peck*, 204 F.3d 1003 (10th Cir. 2000)), where the Court rejected a party's claim that a proffered race-neutral explanation, which relied in part on a mistaken belief or erroneous information, was pretextual as a matter of law because the appellant failed to "articulate how the mistake, which was an understandable error in recollection, should give rise to an inference of discrimination." One significant difference between *Hurd* and the instant case is that in *Hurd*, both the party opposing the strike and the trial court corrected the proponent of the strike, whereas the erroneous information went completely unchallenged in the instant case due to defense counsel's oversight. *Id*. at 1547. As there was no basis in the record for the reason proffered by the State to strike juror Pittman, we are not willing to

26

accept the State's unsubstantiated "race-neutral" reason, especially after having found other instances of the State's racially motivated actions during the voir dire process. As the United States Supreme Court stated in *Miller-El*, if the reason given by the State "does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." *Miller-El*, 125 S.Ct. at 2332.

### *Juror 21 - Alexander Robinson*

¶43. When asked for the race-neutral reasons that the State was striking Alexander Robinson, counsel for the State responded "he is not in favor of the death penalty, and on his questionnaire he has voted not guilty on a case in the past. And that is the two main reasons on him." Though Flowers' counsel rebutted the State's proffered reasons by stating that "[o]n the issue of the death penalty, the fact that he has accepted white jurors with similar views," the trial court upheld the strike based on the race-neutral reason that Robinson had voted not guilty in a previous case.

¶44. Flowers contends on appeal that both of the State's proffered reasons for striking Alexander Robinson were a pretext for racial discrimination. Regarding Robinson's opposition to the death penalty, Flowers contends that he was not as opposed to the death penalty as white jurors who were accepted by the State. The record reflects that although Robinson stated "I don't favor no death penalty," he never stated that he could not vote for the death penalty, as Debbie Collins did prior to being rehabilitated. In fact, when asked if he could put aside his personal beliefs to vote in favor of the death penalty, Robinson said

27

that he could if the court authorized it. Though it appears that Robinson's apprehension regarding the death penalty may not be as strong as that expressed by Collins and possibly Holifield, the fact that Robinson expressed some opposition to the death penalty is a valid race-neutral reason for striking him. **Berry**, 802 So. 2d at 1042 (challenging juror based on view of death penalty is acceptable race-neutral reason). Any inference of pretext that can be drawn from the seeming disparity in striking Robinson but not Collins or Holifield is lessened by the fact that the State gave an additional race-neutral reason for exercising the strike against Robinson.

¶45. Flowers also challenges the striking of Robinson on the basis that his prior service on a civil jury which returned a not guilty verdict has no bearing on his ability to be a fair and impartial juror in the instant case.[7] Flowers did not rebut this additional race-neutral reason given by the State at trial, and we have previously upheld a challenge on this ground as being race-neutral. We do not usually hold a trial court in error for basing his ruling on the State's race-neutral reasons when the State offers multiple race-neutral reasons and the defendant has failed to rebut all of those reasons. **Woodward**, 726 So. 2d at 534. *See also* **Berry**, 802 So. 2d at 1037. Based on the evidence in the record, and especially considering Flowers'

---

[7] Flowers challenges as pretextual the fact that the prior jury on which Robinson served was civil. Prior service on a jury that rendered a not guilty verdict has been held to be a valid race-neutral reason. *See* **Harper v. State**, 635 So. 2d 864, 868 (Miss. 1994). **Harper** involved an instance where the challenged juror had previously served on jury in a criminal case. Neither party has cited a case that makes a distinction between prior service on a civil or criminal jury, for purposes of a **Batson** challenge.

failure to offer rebuttal on Robinson's prior jury service at trial below, we find that the trial court decision to uphold the strike of Alexander Robinson was not clearly erroneous.

¶46. While we do not find the trial court's ruling concerning the strike of Alexander to be clearly erroneous, the racial neutrality of the State's proffered reasons is highly suspect. Robinson did indicate that he did not favor the death penalty but also stated that he could apply the death penalty if the court authorized it. Furthermore, he never stated that he could not vote for the death penalty, unlike Debbie Collins, a white juror who stated she could not vote for the death penalty before she was rehabilitated.

¶47. The State also challenged Robinson because he had voted not guilty in a previous trial. While this Court has previously held that prior service on a jury rendering a not guilty verdict is a valid race-neutral reason for exercising a peremptory strike, we are not inclined to extend **Harper**, at 868, to cover a situation where, as here, a prosecutor struck a juror based on his prior vote in a civil case, rather than a criminal case. We would also note that a juror's prior vote on a civil jury has little, if any, relevance to how that juror may vote in a capital murder trial. This proffered reason by the State becomes more susceptible to an inference of pretext since the State did not question other white jurors about prior jury service.[8] Where the prima facie case of discrimination is very strong, as it is here, we will

---

[8] Flowers points out that the State did not question Anne Austin, a white woman, regarding her service on a jury that rendered a partial verdict. Also, Carolyn McCoy, a white woman, was not questioned by the State regarding her service on a civil jury, and her questionnaire provided no answer as to whether a verdict was returned. The State did question Robinson briefly concerning jury service, merely asking if he had served and if the verdict had in fact been not guilty. Austin was struck for cause; Flowers exercised a peremptory strike against McCoy; and neither of these jurors (who supposedly shared a characteristic for which Robinson was struck) ultimately sat on the jury.

29

more closely scrutinize a supposedly race-neutral reason that has little relevance to the case-at-hand. *See **Davis v. State***, 551 So. 2d 165, 170 (Miss. 1989) (requiring prosecutor to "articulate a neutral explanation related to the particular case to be tried.").

*Juror 22 - Byron Minnieweather*

¶48. The State struck Minnieweather because the prosecutor had previously prosecuted Minnieweather's father "in a pretty heated manslaughter trial" in Montgomery County and he was not comfortable leaving Minnieweather on the jury because of the heated nature of the trial. Flowers rebutted this race-neutral reason by arguing that the State had accepted a white juror, Bane, who had a family member who had previously been prosecuted for a crime. The trial court upheld the State's strike of Minnieweather based on the prior prosecution of his father, reasoning that "I know from my personal experience that it was a heated incident that there was a lot of interest in this community, and because of that, that certainly is a race neutral reason for striking juror number 22."

¶49. Flowers argues that the strike of Minnieweather was pretextual because the State did not voir dire white jurors concerning family members who had been prosecuted for a crime nor did the State attempt to strike such jurors. Minnieweather's father was tried in Montgomery County by the same prosecutor who is prosecuting the instant case in a trial that the judge admitted was "heated." The State contends that the situation concerning Minnieweather is distinguishable from that of Bane because Bane's nephew was not charged and/or tried in Montgomery County and there would be less likelihood that Bane would have personal animosity towards the prosecution or the judge.

30

¶50. Flowers did not present the trial court with the names of other white jurors who had family members who had been prosecuted but were acceptable to the State; however, he now raises these names before this Court in an attempt to show that Minnieweather received disparate treatment from white jurors who had family members with criminal charges and/or convictions. Our review of the record reflects that these other criminal convictions are neither as factually similar nor as emotionally charged as the case against Minnieweather's father.[9] Also, three of the five white jurors (Cross, Austin, and Flowers), whom Flowers claims the State failed to question about crimes committed by family members, did not serve on the jury because Flowers himself struck them. An additional juror, Richardson, was initially seated but later released due to an illness in the family. Thus, Kemp was the only white juror with a family member facing or convicted of criminal charges who actually served on the jury that convicted Flowers. However, the fact that Kemp's cousin faced a

---

[9] Phillip Cross indicated on his jury questionnaire that his brother had been found guilty on drug charges; however, the State did not voir dire him concerning the conviction of his brother. The State argues that any reservations the prosecutor may have had about Cross as a potential juror, based on his brother's conviction, can be resolved by the fact that Cross served as a reserve deputy and was also friends with BoBo Stewart. Mr. Cross did not sit on the jury because Flowers exercised a peremptory strike on him. Jackie Austin wrote on his jury questionnaire that his stepson had been convicted of grand larceny in Tupelo, yet the State did not voir dire him concerning that incident. Austin did not serve on the jury, as Flowers exercised a peremptory strike on him. Carrie Flowers indicated on her questionnaire that her stepson had been charged with theft of a truck, had paid restitution and received probation; however, the State did not voir dire her on this. Ms. Flowers was peremptorily struck by Flowers. Sherry Richardson indicated during group voir dire that her ex-husband had been convicted of a crime in Grenada County roughly ten years prior, yet the State did not question her concerning his conviction. Although Richardson was initially chosen to sit on the jury, she was later released when her sister had a heart attack. Wilma Kemp indicated on her jury questionnaire that she had a cousin who had been charged with child molestation; however, the State did not voir dire Kemp as to whether the charge against her cousin would affect her ability to sit on this case.

molestation charge, in a jurisdiction unknown to the court, is distinguishable from a "heated" manslaughter case in which a juror's father was prosecuted in the same jurisdiction and by the same prosecutor as the instant case.

¶51.    That Minnieweather's father was prosecuted for manslaughter in Montgomery County by the district attorney in this case and tried by the judge in this case, is sufficient grounds to support a peremptory challenge. *See Lynch v. State*, 877 So. 2d 1254, 1271-72 (Miss. 2004) (finding criminal history of juror or juror's family member to be race-neutral reason). As such, we find this strike to be race-neutral for purposes of a *Batson* analysis. While the peremptory strike of Minnieweather, an African-American, may have been sufficiently race-neutral, that the State failed to voir dire white jurors concerning a characteristic which the State deemed important in its decision to strike Minnieweather evinces disparate treatment and leads to an inference that race played a role in the State's jury selection process. *See Manning*, 765 So. 2d at, 519  (recognizing failure to voir dire as to a characteristic cited and disparate treatment as indicia of pretext).

*Juror 25 - Luther Paul Robinson*

¶52.    When the State was asked its reasons for striking Luther Robinson, the following exchange took place:

> By Mr. Evans:  The two reasons that I have got down on him is one, he did not answer the death penalty question on his questionnaire.  Two, I specifically asked him if his son was Trae when he said he had had no family members arrested or in trouble.  And his son has been in trouble with drugs. As a matter of fact, the house has even been raided in Duck Hill by the drug folks before.  I find it hard to believe that he wasn't aware.  I might could believe that he wasn't aware that his son wasn't [sic] selling, but the fact that

32

he didn't even know anything about them being after his son for drugs, I have some problem believing since the house was searched.

By the Court: Are you sure these are the same people?

By Mr. Evans: Yes, sir. This is, Chief Hargrove is one. I'm not sure if the Sheriff was one of the ones that had this information. I know Chief Hargrove was one of them.

By Mr. De Gruy: Our position is that evidence has to be presented in court for the Court to make a factual determination.

By the Court: Well, he asked him specifically about his son, and he said that his son was not, had not been in trouble with the law. I think they can then make that determination from inquiry with the officers as to whether or not that is true to give them a basis for striking him on a peremptory challenge, and I find that that is race neutral.

Flowers now contends that the reasons offered by the State were not the true reasons for striking Robinson but rather were merely a pretext for discrimination.

¶53.    Flowers did not rebut the State's first race-neutral reason for striking Robinson at trial, Robinson's failure to answer the death penalty question on his jury questionnaire, and even now, he makes no effort to address this reason on appeal.[10]  In **Lynch**, this Court articulated several valid race-neutral reasons for exercising a strike and among them were a prosecutor's distrust of a juror and inconsistency in a juror's oral response and information from his/her juror card.  **Lynch**, 877 So. 2d at 1271-72.  Though failure to answer a question on a juror card was not expressly held to be a race-neutral reason in **Lynch**, the list of reasons given in that case were deemed non-exhaustive.  We decline to find the State's proffered reason

_____

[10]  During individual voir dire, counsel for the State actually asked why Robinson failed to answer the death penalty question on his jury questionnaire and he responded that "I was unaware of it because I had my wife helping me with it, and maybe, maybe she just overlooked it."

pretextual, especially since Flowers did not object below and the trial court was not given the opportunity to rule on the validity of this race-neutral reason.

¶54.    Flowers contends on appeal that the State struck Robinson because his son had been arrested on drug charges and that this reason is pretextual because other white jurors also had relatives that were arrested and/or convicted of a crime. *See discussion concerning juror Minnieweather, supra*. We would point out that the basis for the State's striking of Robinson was not so much that his son was arrested, though the State's reasoning encompasses the arrest itself, but rather, the reason the State struck Robinson was because the prosecutor believed that he was being untruthful in denying any knowledge of his son's arrest. At trial, Flowers did not rebut the truthfulness of the State's assertion that Robinson's son had been arrested for drugs, he only contended that the State should be required to present evidence in court so the judge could make a factual determination.

¶55.    The State argues that the trial court did not err by not requiring it to introduce evidence of Robinson's son's arrest into the record. *See **Snow***, 800 So. 2d at 482. In ***Snow***, this Court determined that it was not necessary for the State to introduce evidence of bad-check complaints issued against the juror being struck. ***Id***. The ***Snow*** court declined to "set any limits" on the "use of any legitimate informational source" available to a prosecutor regarding jurors, and further stated that a "prosecutor does not have to question a juror in open court about such information before using it as a racially neutral ground to make a peremptory strike, as long as the source of the information and the practice itself are not racially discriminatory." ***Id***. (citation omitted).

34

¶56.    That a juror's relative has been charged with a crime and a prosecutor's distrust of a juror have both been upheld by this Court as valid race-neutral reasons for a peremptory challenge. *See* ***Lynch***, 877 So. 2d at 1271-72. In the instant case, the prosecutor alleged that he had information concerning the arrest of Robinson's son, questioned Robinson as to whether he had knowledge of that arrest, and Robinson replied that he was unaware of any criminal charges against his son. The prosecutor later stated that he did not believe Robinson when he denied knowing about his son's drug-related activities since law enforcement officers had previously conducted a drug raid at Robinson's house. As these are valid race-neutral reasons for exercising a peremptory strike, and Flowers has totally failed to rebut the first reason proffered by the State, we find that the State presented sufficient evidence to support a finding that the strike was race-neutral and the trial court's ruling was not clearly erroneous. *See* ***Woodward***, 726 So. 2d at 534 (where defendant failed to rebut all race neutral reasons offered by State, trial court did not err in basing ruling on the reasons offered by State).

*Juror 28 - Jessie Hearn*

¶57.    The State articulated its reasons for striking Jessie Hearn as follows:

> He knows the Defendant. He knows the Defendant's family. He had an opinion that the Defendant was innocent, and he has voted not guilty in a case before. I take that back. He said he would automatically vote against the death penalty, and then the Court ruled he had been rehabilitated, but he said he would automatically vote against it.

Flowers initially offered no rebuttal, and the trial court upheld the strike, noting that Hearn "was equivocal in his answers, and I did allow him to be rehabilitated, but it was a close call

35

on his questions and answers in response to the death penalty. So I find that his responses were sufficient to be race neutral, and I do find that that was a race neutral strike." After the parties had begun addressing another peremptory strike, counsel for Flowers tardily rebutted the striking of Hearn by stating "my offer of rebuttal as to all of those including S-11 [Jessie Hearn] is that they were accepting similarly situated whites, Ms. Holifield and Collins." The trial court, after hearing Flowers' rebuttal, once again upheld the strike and expressed his belief that jurors Holifield and Collins were not similarly situated to Hearn, as Flowers contended.

¶58. On appeal, Flowers contends that the State's proffered reasons for striking Hearn, that Hearn had already formed an opinion that Flowers was innocent and had stated he would automatically vote against the death penalty, were a pretext for racial discrimination. Though Flowers now rebuts, as pretextual, the fact that Hearn had formed an opinion as to Flowers' innocence before trial, he did not rebut this race-neutral reason at trial nor did he rebut other reasons given by the State, that Hearn knew Flowers and Flowers' parents. Even now, Flowers does not rebut Hearn's relationship with the Flowers family as being a pretext for discrimination.

¶59. Flowers did not rebut all of the race-neutral reasons given by the State at trial, and as we have previously stated, it is not erroneous for a judge to base his ruling only on the State's proffered reasons. *See* ***Woodward***, 726 So. 2d at 534. Furthermore, we find no merit to Flowers' claim that Hearn's ambivalence on the death penalty was less than that expressed by Holifield and Collins. As stated *supra*, Holifield said she did not know if she could be the

36

one to say someone should die for their crime and that it would be difficult to vote for the death penalty, yet she never indicated she was absolutely opposed to it. Also, she eventually stated that "I guess I could" vote for the death penalty. Ms. Collins did state at one point that she could not give a verdict of death but, she was later rehabilitated and indicated that she could vote for the death penalty.

¶60. Apart from stating that he had already formed an opinion that Flowers was not guilty and at one point indicating that he could not vote guilty, Hearn indicated that he "probably would" automatically vote for a life sentence as opposed to the death penalty. Hearn's responses during voir dire indicated that his respect for Flowers' parents would make it difficult for him to find Flowers guilty and to impose the death penalty.[11] When looking at the totality of the circumstances, including the fact that Flowers failed to rebut three of the four race-neutral reasons proffered by the State, we find that the trial court had sufficient evidence before it to uphold this strike as being race-neutral.

*Juror 48 - Josephine Powell*

¶61. When the State attempted to exercise a peremptory challenge against Josephine Powell, the following exchange took place:

> By Mr. Evans: Yes, Your Honor. She stated at one point that she would just vote for life. She also did not answer the questionnaire as far as the death penalty. She stated specifically that she didn't know if she could ever vote for

---

[11] The fact that a juror has already formed an opinion about the case is a valid race-neutral reason. *See Ryals*, 794 So. 2d at 166. Opposition to the death penalty is also a sufficient race-neutral reason. *See Berry*, 802 So. 2d at 1042.

the death penalty.  She knows the Defendant.  She knew him years ago.  She knows the Defendant's mother.

By the Court:  Mr. de Gruy?

By Mr. De Gruy:  In rebuttal, Your Honor, on the questionnaire, this panel was summonsed by phone yesterday afternoon, and they were filling out the questionnaires this morning as we were collecting them.  So it may just simply have been inadvertent that she didn't get finished with the questionnaire.  Her position on the death penalty is similar to Holifield and Collins that we discussed yesterday, both white jurors.  And while she said she knew Mr. and Mrs. Flowers, she also knew Ms. Tardy.

By the Court: Okay.  The Court finds that when she took the stand in this voir dire period, her answers were so equivocating and unclear and went back and forth to justify a peremptory challenge on there that would be race neutral based on the way she testified.  And therefore, I rule that it was, that this is a race neutral strike.  She did have some contacts with the family and all too.  But I find that it is a race neutral challenge and meets ***Batson***, and it is not pretextual.

The State offered three race-neutral reasons which were rebutted by Flowers, yet the trial court, noting the equivocation in many of Powell's responses, ruled that the race-neutral reasons offered by the State met the requirements of ***Batson*** and upheld the peremptory challenge.  Flowers argues on appeal that Powell's opinions were no different from those of white jurors whom the State accepted or that the reasons given by the State below do not accurately reflect the record and that the striking of Powell was racially motivated.

¶62.   The record reflects that Powell indicated she knew Flowers' parents, and the prosecutor appeared to misspeak when he stated that Powell knew Flowers, the defendant.[12]

---

[12]   When Counsel for the State asked if Powell knew "Mr. Flowers," she said "yes" and stated "I knew him years ago when, when he worked at - - I can't think of - - seemed like it was a drug store, seemed like."  When asked if she knew any of Flowers' family, Powell indicated that she knew his wife Lola Flowers.  These statements indicate that Ms. Powell thought the State was referring to Curtis Flowers' father, Archie, when she was asked about "Mr. Flowers."

Powell indicated that she had known Flowers' mother for a long time, roughly twenty years. These connections are sufficient, despite the prosecutor's misstatement, to establish that Powell had a prior relationship with members of the defendant's family, a valid race-neutral reason which this Court has repeatedly recognized. *See **Perry***, 637 So. 2d at 873-74.

¶63. As far as Powell's opposition to the death penalty, when she was initially asked by the judge whether she could vote for the death penalty, she stated "I don't think I could." When counsel for the State asked her essentially the same question, she indicated she was strongly against the death penalty, saying "I would, I, my personal opinion would be, you know, just life, life imprisonment." When the prosecutor asked if her beliefs against the death penalty would keep her from voting for the death penalty regardless of the facts, she stated "I would vote for, I would vote for the life." When Flowers' counsel later questioned her, Powell indicated that she could follow the court's instructions and eventually responded "Yes. I think so" to counsel's question as to whether she could vote for the death penalty if the facts were bad enough. The record reflects that Powell's ambivalence about or opposition to the death penalty is comparable to, if not greater than, that of Holifield and Collins, discussed *supra*. Even if we were to infer pretext based on a comparison of Powell's views on the death penalty with those of Collins and Holifield, any inference of pretext disappears when we consider that Powell also knew members of Flowers' family while Collins and Holifield did not. *See **Berry***, 802 So. 2d at 1040 ("Where multiple reasons lead to a peremptory strike, the fact that other jurors may have some of the individual characteristics of the challenged juror does not demonstrate that the reasons assigned are pretextual.").

¶64.   Flowers also rebutted the fact that Powell had not answered the death penalty question on the jury questionnaire by stating that Powell had been summonsed by phone the previous day, she was filling out the questionnaire that very morning, and he opined that it was "inadvertent that she didn't get finished with the questionnaire." The reason proffered by the State is race-neutral on its face since race was not referenced; however, we are wary of accepting this as a "valid" race-neutral reason. The record reflects that many jurors left questions unanswered on their jury questionnaire, yet the State did not raise their failure to answer a question as a grounds for exercising a strike. If the State felt strongly enough about Powell's failure to answer a particular question on her jury questionnaire, the State could have voir dired her concerning her failure to respond, rather than manufacturing this purportedly race-neutral reason after voir dire was concluded. Moreover, the State did voir dire Powell concerning her belief in the death penalty and whether she could faithfully apply the law in the instant case, which makes the State's argument that it struck Powell because of her failure to answer a question on her jury questionnaire even more suspect.

¶65.   The State offered multiple race-neutral reasons for striking Powell which Flowers rebutted, yet the trial court ultimately found Flowers' rebuttal unpersuasive and upheld the peremptory strike as race-neutral. Though we find that Powell's failure to answer the death penalty question on her jury questionnaire is not a valid race-neutral reason in this particular instance, we do find that the State introduced sufficient evidence regarding Powell's relationship with the Flowers family and her ambivalence about the death penalty to support the trial judge's finding that the strike was race-neutral, so that his ruling is not clearly

40

erroneous. *See Walker*, 815 So. 2d at 1214 (stating trial court's ruling on *Batson* claim will not be reversed unless "clearly erroneous or against the overwhelming weight of the evidence.").

**III.**

¶66. The instant case presents us with as strong a prima facie case of racial discrimination as we have ever seen in the context of a *Batson* challenge, and though the sheer number of strikes exercised against a cognizable group of jurors is not itself dispositive of our analysis, "the relative strength of the prima facie case of purposeful discrimination will often influence this inquiry" into *Batson* challenges. *Sewell v. State*, 721 So. 2d 129, 136 (Miss. 1998); *see also Mack v. State*, 650 So. 2d 1289, 1298 (Miss. 1994) (stating that "[t]he stronger the prima facie case, the more cogent the explanations from the state and supporting evidence must be and vice versa.") (citation omitted). Of the six hundred summonses sent out to potential jurors in this case, three hundred juror questionnaires were filled out by potential jurors and received by the court in response to the summonses. At least 120 potential jurors indicated that they were of African-American descent, meaning that at least forty percent of the potential jury pool was African-American. This percentage closely tracks the racial demographics of Montgomery County, as defense counsel asserted that African-American citizens comprise forty-five percent of the county's population. The prosecutor exercised all fifteen of his peremptory strikes on African-Americans, and the lone African-American who

41

ultimately sat on Flowers' jury was seated after the State ran out of peremptory challenges.[13]

Such a result cannot be considered "happenstance." *See Miller-El v. Cockrell*, 537 U.S. 322, 342, 123 S.Ct. 1029, 1042, 154 L.Ed. 2d 931 (2003).[14]

¶67. While many of the seeming discrepancies in the jury selection process can be explained away by application of procedural bars, defense counsel's failure to rebut all of the State's race-neutral reasons, or genuine concerns about a juror's fitness to serve on the jury, the facts and law before this Court compel us to find a *Batson* violation in the instant case. The peremptory challenge exercised against Vickie Curry was clearly pretextual, as there was no basis in the record for two of the grounds proffered by the State, and the State's third ground was predicated on Curry's acquaintance with Flowers' sister ten years prior, a tenuous relationship at best. Our finding that the trial court erred in upholding the strike of Curry is bolstered by the trial court's own erroneous statement that "the State has a right to exercise a challenge based on some of the answers from the other jurors as far as their peremptory challenge goes." Also, the State's actions in striking Connie Pittman are equally

---

[13] A second African-American was initially selected, but later was removed from the jury when he acknowledged that he misstated his beliefs.

[14] The *Miller-E*l Court stated that:
> The prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members and only one served on petitioner's jury. In total, 10 of the prosecutors' 14 peremptory strikes were used against African-Americans. Happenstance is unlikely to produce this disparity.

*Miller-El*, 537 U.S. at 342.

specious, as there is absolutely no evidence in the record to support the State's proffered reason for striking her.

¶68. While there was sufficient evidence to uphold the individual strikes of Golden, Reed, and Alexander Robinson under a "clearly erroneous" or "against the overwhelming weight of the evidence" standard, these strikes are also suspect, as an undertone of disparate treatment exists in the State's voir dire of these individuals. The striking of Golden is suspect because her views on the death penalty were nearly indistinguishable from those of two white jurors who ultimately served on the jury, suggesting disparate treatment. The striking of Reed is suspect because there is no evidence in the record to show that she had any connection with members of Flowers' family, despite the fact that she had previously worked at the same business as those family members. The peremptory challenge to Alexander Robinson is also suspect because his opposition to the death penalty was not as strong as that of two white jurors who served, and his prior service on a civil jury that voted not guilty has little bearing on his ability to be fair and impartial in a criminal case. The genuineness of Robinson's prior jury service as a reason for the State to strike him is questionable since the State failed to voir dire other white jurors concerning their prior jury service. While each individual strike may have justifiably appeared to the trial court to be sufficiently race neutral, the trial court also has a duty to look at the State's use of peremptory challenges *in toto*. *See Miller-El*, 125 S.Ct. at 2331 (the ruling in *Batson* "requires the judge to assess the plausibility of that reason in light of *all evidence* with a bearing on it."); *Stewart v. State*, 662 So. 2d 552, 559 (Miss. 1995) ("the trial court must consider *all the relevant circumstances*,

43

such as the way prior peremptory strikes have been used and the nature of the questions posed on voir dire."); ***Lewis v. Lewis***, 321 F.3d 824, 831 (9th Cir. 2003) ("After analyzing each of the prosecutor's proffered reasons, our precedent suggests that the court should the step back and evaluate all of the reasons together.") (Emphasis added). Though a reason proffered by the State is facially neutral, trial judges should not blindly accept any and every reason put forth by the State, especially where, as here, the State continues to exercise challenge after challenge only upon members of a particular race.

¶69. Because racially-motivated jury selection is still prevalent twenty years after ***Batson*** was handed down and because this case evinces an effort by the State to exclude African-Americans from jury service, we agree that it is "necessary to reconsider ***Batson***'s test and the peremptory challenge system as a whole." ***Miller-El***, 125 S.Ct. at 2344 (Breyer, J., concurring). While the ***Batson*** test was developed to eradicate racially discriminatory practices in selecting a jury, prosecuting and defending attorneys alike have manipulated ***Batson*** to a point that in many instances the voir dire process has devolved into "an exercise in finding race neutral reasons to justify racially motivated strikes." ***Howell***, 860 So. 2d at 766 (Graves, J., dissenting). When ***Batson*** was handed down, Justice Marshall predicted that "[m]erely allowing defendants the opportunity to challenge the racially discriminatory use of peremptory challenges in individual cases will not end the illegitimate use of the peremptory challenge." ***Batson***, 476 U.S. at 105 (Marshall, J., concurring). Unfortunately, as this case has shown, Justice Marshall was correct in predicting that this problem would not subside. His solution to this problem was to ban peremptory challenges outright, a

44

position later advocated by Mississippi Supreme Court Justice Michael Sullivan. *See*

*Batson*, 476 U.S. at 108 (Marshall, J., concurring) (stating that "only by banning

peremptories entirely can such discrimination be ended."); *Thorson v. State*, 653 So. 2d 876,

896 (Miss. 1994) (Sullivan, J., concurring) (stating that "the proper remedy for this type of

situation is the complete elimination of peremptory challenges in the trial courts of

Mississippi.").

¶70.    One of the principles undergirding the *Batson* decision itself is that "the Equal

Protection Clause forbids the prosecutor to challenge potential jurors solely on account of

their race or on the assumption that black jurors as a group will be unable impartially to

consider the State's case against a black defendant." *Batson*, 476 U.S. at 89.  And while

numerous studies have been conducted in an effort to quantify the effects that race has on

jury verdicts,[15] the United States Supreme Court has been critical of such studies because

these types of statistical analyses don't "prove that race enters into any capital sentencing

decisions or that race was a factor in [an individual defendant's] particular case." *McCleskey*

---

[15] Sommers and Ellsworth conducted an analysis of numerous social science studies which purported to address "the relationship between race and criminal jury decision making."  Samuel R. Sommers & Phoebe C. Ellsworth, *Symposium: The Jury at a Crossroad: The American Experience, II. the Jury and Race, How Much Do We Really Know about Race and Juries? A Review of Social Science Theory and Research*, 78 Chi.-Kent L. Rev. 997 (2003).  The various studies analyzed in their article employed one of three methodologies: (1) archival analysis of verdicts in actual cases; (2) post-trial interviews with jurors; and (3) mock jury experiments. *Id*. While the differing studies tended to show that race can be and does become a factor in the decision-making process of juries, Sommers and Ellsworth were quick to point out that "[f]or any particular case, few researchers would dare claim that they could predict exactly how and to what extent race will influence the final verdict." *Id*. at 1030-31.  It is for this very reason that the *Batson* test was developed and why our courts prohibit race-based challenges.

*v. Kemp*, 481 U.S. 279, 308, 107 S.Ct. 1756, 95 L.Ed. 2d 262 (1987). ***Batson*** makes clear that each juror must be evaluated on his/her own merits, not based on supposed group-based traits or thinking. Despite the fact that race still seems to be a prevalent consideration in jury selection and/or deliberations, it appears unlikely that any courts will be soon willing to take the unprecedented and seemingly extreme measure of abolishing the peremptory challenge system in its entirety.

¶71.    One alternative to the abolition of peremptory challenges is the adoption of a rule that permits only limited voir dire, similar to the rule in Maryland. *See **Dingle v. State***, 759 A.2d 819 (Md. 2000). Maryland grants a trial judge "broad discretion in the conduct of voir dire, most especially with regard to the scope and the form of the questions propounded," and the judge "need not make any particular inquiry of the prospective jurors unless that inquiry is directed toward revealing cause for disqualification." ***Dingle***, 759 A.2d at 826. Maryland recognizes two areas of inquiry that may properly uncover cause for disqualification:

> (1) an examination to determine whether prospective jurors meet the minimum statutory qualifications for jury service, see Maryland Code (1974, 1989 Repl. Vol., 1992 Cum. Supp.), Courts & Judicial Proceedings Article, § 8-207; or (2) "'an examination of a juror . . . conducted strictly within the right to discover the state of mind of the juror in respect to the matter in hand or any collateral matter reasonably liable to unduly influence him.'"

*Id*. at 823 (citations omitted). The Court of Appeals in Maryland has instructed the lower courts that questions asked during voir dire "should focus on issues particular to the defendant's case so that biases *directly related* to the crime, the witnesses, or the defendant

46

may be uncovered."[16]  *Id*. at 824 (emphasis added).  Various commentators have also suggested category-conscious jury selection, harsher sanctions, enhanced voir dire, or changing the way courts scrutinize the second step of **Batson**, as alternatives to outright elimination of the peremptory challenge system.  Antony Page, *Batson's Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge*, 85 B.U. L. Rev. 155, 246-61 (2005) (analyzing alternatives to eliminating peremptory challenge system).

¶72.    While we neither abolish peremptory challenges, nor adopt a limited voir dire rule, nor make any specific changes to our peremptory challenge system, we are inclined to consider such options if the attorneys of this State persist in violating the principles of **Batson** by racially profiling jurors.  Because it is well recognized that the right to an "impartial jury and fair trial" is guaranteed by our Constitution, but that "the right of peremptory challenge is not of constitutional magnitude," we would be well within our authority in abolishing the peremptory challenge system as a means to ensure the integrity of our criminal trials.  *See* **Batson**, 476 U.S. at 108 (Marshall, J., concurring).

**CONCLUSION**

¶73.    After carefully reviewing the record before this Court and the applicable law, we find that the State engaged in racially discriminatory practices during the jury selection process

---

[16]  The Court in *Uzzle v. State* has also instructed:
Questions not directed to a specific ground for disqualification but which are speculative, inquisitorial, catechising or "fishing", asked in aid of deciding on peremptory challenges, may be refused in the discretion of the court, even though it would not have been error to have asked them.
832 A.2d 869, 875 (Md. Ct. Spec. App. 2003) (citation omitted).

and that the trial court committed reversible error in upholding the peremptory strikes exercised against Vickie Curry and Connie Pittman. Based on the State's *Batson* violation, we are required to reverse the judgment of the Montgomery County Circuit Court and remand this case for a new trial. *See Batson*, 476 U.S. at 100 (finding of *Batson* violation requires reversal); *Dawson v. Delaware*, 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed. 2d 309 (1992) (Blackmun, J., concurring) (reiterating that a *Batson* violation is not subject to harmless-error analysis). Accordingly, the trial court's judgment is reversed, and this case is remanded for a new trial consistent with this opinion.

¶74. **REVERSED AND REMANDED.**

**WALLER, P.J., DIAZ AND DICKINSON, JJ., CONCUR. COBB, P.J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION JOINED IN PART BY DICKINSON, J. SMITH, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY EASLEY, CARLSON AND RANDOLPH, JJ.**

**COBB, PRESIDING JUSTICE, CONCURRING IN RESULT ONLY:**

¶75. I concur with this Court's judgment reversing the trial court's judgment and remanding this case for a new trial. The plurality has provided a very thorough and instructive analysis of the *Batson* process, which should be useful, not only to the prosecutors who will be trying this case upon remand, but also to all prosecutors and defense attorneys alike, as they engage in future jury selection arguments. I write separately because I do not agree that this case is reversible on the *Batson* issue alone.

¶76. In the course of the four-day jury selection process, there were many close calls to make, as is obvious from the details provided in the majority opinion. There were errors

48

made by attorneys for both sides. We now must decide, *inter alia*, whether all of them taken into account, rise to the level of cumulative error which necessitates reversal. We are mindful of the fact that we do not have (and never will have) one important ingredient: namely, the benefit of being in chambers during the debates regarding each strike, and in the court room during the entire voir dire process. Only there is it possible to observe the body language, demeanor, inflections and other visual and auditory keys which help the trial court make its decisions. We work from a cold record, with mere printed words which cannot convey the full and complete picture. This is but one reason this Court gives great deference to a trial court's ruling on *Batson* issues, as well as others which arise in the course of a trial. In *Berry v. State*, 802 So. 2d 1033, 1037 (Miss. 2001), we stated that we give such "deference to the trial court's determinations under *Batson* because they are based largely on credibility". As to the *Batson* issue alone, I do not find reversible error. However, I do see the errors pointed out by the plurality, and they, viewed in the aggregate with others which I mention briefly, infra, result in cumulative error sufficient to warrant a new trial.

¶77. Flowers raised eighteen issues on appeal, which need not be specifically enumerated here, but which included: three regarding the jury selection process; one regarding mention of a polygraph test; one regarding testimony of prior bad acts but no limiting instruction; one regarding cross examination of a defense witness without a factual basis; two regarding victim impact evidence during the guilt phase as well as the sentencing phase; one regarding victim family members' opinions about the defendant and the appropriate sentence; one regarding denial of redirect examination of a defense witness; five regarding jury

49

instructions; two regarding quashing the indictment and constitutionality of the capital murder statute; and, finally, cumulative error.

¶78.   While there were many errors during the six day trial which followed the seating of the jury, I mention only three which, in my view, are sufficiently serious to warrant specific mention: first, the admission of prior bad acts testimony, without giving the defendant's requested limiting instruction; second, allowing the State to cross-examine a defense witness without ever establishing a factual basis for the line of questioning; third, allowing the victim's family members to testify about the crime, the defendant, and the appropriate sentence which should be given. These I would deem harmless error individually, but in the aggregate (including the errors noted in the majority opinion with regard to the **Batson** issue) lead me to find cumulative error sufficient to warrant reversal and remand for new trial.

¶79.   Our case law has long allowed an accumulation of otherwise harmless error to result in reversal. See **Griffin v. State**, 557 So. 2d 542, 552-53 (Miss. 1990). In **Jenkins v. State**, 607 So. 2d 1171, 1183-84 (Miss. 1992) we stated that errors in the lower court which do not require reversal standing alone, may, taken cumulatively, require reversal. In **Byrom v. State**, 927 So. 2d 709, 730 (Miss. 2006), in clarifying the scope of appellate review of cumulative error, we held that in "cases in which we find harmless error or any error which is not specifically found to be reversible in and of itself, we shall have the discretion to determine, on a case-by-case basis, as to whether such error or errors, although not reversible when standing alone, may when considered cumulatively require reversal because of the resulting cumulative prejudicial effect."

50

¶80.    This case must be reviewed with "heightened scrutiny" as is true with every death penalty case.  In that light, these errors, any one of which might not be sufficient to warrant reversal, when considered together have such a cumulative effect as to require reversal and remand.  As we recently reiterated in **Walker v. State**, 913 So. 2d 198, 250 (Miss. 2005), "[t]his Court has never held that a criminal defendant is entitled to a perfect trial, even with our "heightened scrutiny" standard of review in death penalty cases.  A perfect trial is simply impossible.  A criminal defendant is entitled, however, to a constitutionally fair trial under the Mississippi and United States Constitutions."

¶81.    In my view, the accumulation of numerous errors which might be harmless standing alone, is sufficient to warrant the reversal and remand of this case to the trial court for a new trial.  Therefore, I concur in the result reached by the plurality to reverse and remand, but for different reasons.

**DICKINSON, J., JOINS THIS OPINION IN PART.**

**SMITH, CHIEF JUSTICE, DISSENTING:**

¶82.    I agree with the plurality that the trial judge was correct in ruling that the State's peremptory strikes as to prospective jurors Hamer, Golden, Kendle, Reed, Robinson, Minnieweather, Robinson, Hearn, and Powell, were correct in that the venire members were struck either for neutral reasons under **Batson**,[17] because Flowers failed to rebut all of the race-neutral reasons given by the State, **Woodward v. State**, 726 So. 2d 524, 534 (Miss.

---

[17]**Batson v. Kentucky**, 476 U.S. 79, 106 S. Ct 1712, 90 L. Ed. 2d 69 (1986).

51

1997), or because Flowers raised objections for the first time on appeal and is thus procedurally barred, *Evans v. State*, 725 So. 2d 613, 632 (Miss. 1997). However, as to the plurality's conclusion that the State's use of a peremptory strike against prospective juror Curry violates *Batson*, I disagree. I also disagree with the plurality's finding as to prospective juror Pittman. Therefore, I respectfully dissent.

¶83. "On appellate review, a trial court's determinations under *Batson* are accorded great deference because they are largely based on credibility." *Berry v. State*, 802 So. 2d 1033, 1037 (Miss. 2001). "This Court will reverse only when such decisions are clearly erroneous." *Id*. (citing *Woodward v. State*, 726 So. 2d at 530 ; *Lockett v. State*, 517 So. 2d 1346, 1349-50 (Miss. 1987).

¶84. To find a *Batson* violation, we must analyze the facts under a three-part test:

> First, the [opponent of the strike] must make a prima facie showing that the [proponent] has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the [proponent] to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the [opponent] has carried his burden of proving purposeful discrimination.

*Randall v. State*, 716 So. 2d 584, 586 (Miss. 1998) (alterations in original) (quoting *Hernandez v. New York,* 500 U.S. 352, 358-59, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (plurality opinion) (citations omitted)).

¶85. Before I address my belief that the State's peremptory strike against Curry was proper, as well as my findings as to juror Pittman, I note a distinguishing fact that further confirms

the plurality's finding as to juror Golden: the State's peremptory strike against Golden was in accordance with **Batson**.

¶86.    One of the reasons the State claimed to have exercised a peremptory strike on Golden was because "Ms. Golden was one of the ones that said at one point under no circumstance could she consider the death penalty, that is was against her religion.  And she was barely in my opinion rehabilitated but enough to where she said that she could consider it."  Flowers's counsel rebutted the State's reasoning by arguing Golden's views of the death penalty were similar to white jurors Collins and Holifield, both of whom the State accepted; therefore, Flowers contends the State struck Golden because of her race.

¶87.    In addition to the differences set forth by the plurality between Golden and Collins, Collins also marked her pre-voir dire questionnaire that she had personal or religious beliefs against imposing the death penalty, and expressly stated that after having gone through two days of voir dire, she had changed her mind about the death penalty.  This is hardly an unusual occurrence where, after initially expressing a definite opinion for or against the death penalty, a juror will admit that the "education" provided in the overall voir dire process has convinced that juror to change his/her mind about the death penalty.  After all, most citizens who come into the voir dire process as potential jurors in any criminal case, much less a death penalty case, are totally uninformed as to the criminal process and procedure, and voir dire becomes a valuable educational experience for the members of the jury venire. In this vein, Collins went from initial opposition to the death penalty to being able to vote for the death penalty "if the law authorized it and the facts justified it."

¶88.   On the other hand, Golden went from having no personal or religious beliefs which would prohibit her from imposing the death penalty (based on her pre-voir dire questionnaire), to expressing in voir dire that she could not impose the death penalty in any case, to guessing that she could "consider" the death penalty, to stating that she could vote for the death penalty.   The record reveals that in the end, there was significantly more equivocation by Golden, as opposed to Collins, on the issue of the death penalty.

¶89.   As to the State's exercise of a peremptory challenge against Curry, at issue are the second and third steps of the **Batson** analysis.  As to the second step, I find the State offered race-neutral explanations for striking prospective juror Curry.  First, the State used a peremptory strike on Curry because Curry had previously worked with Flowers's sister.  This Court has found that the use of a peremptory strike on a juror who is acquainted with a defendant's family is a valid race-neutral reason.  **Davis v. State**, 767 So. 2d 986, 995 (Miss. 2000); **Manning v. State**, 735 So. 2d 323, 340 (Miss. 1999).

¶90.   Second, the State also argued it struck Curry because of her husband's conviction for burglary. This Court has found that use of a peremptory strike on a juror who has been convicted is a valid race-neutral reason.  **Lynch v. State**, 877 So. 2d 1254, 1271-72 (Miss. 2004); **Manning**, 735 So. 2d at 340.  Although the State did not voir dire Curry on the subject, this Court has held a "prosecutor does not have to question a juror in open court about such information before using it as a racially neutral ground to make a peremptory strike, as long at the source of the information and the practice itself are not racially discriminatory." **Snow v. State**, 800 So. 2d 472, 482 (Miss. 2001).  The State told the trial

54

judge that one of its investigators, John Johnson, had run-ins with Curry's husband and helped convict Curry's husband of a nursing home burglary. Although Flowers argued that the State did not strike white jurors whose relatives had been prosecuted and/or convicted, the State points out a distinguishing fact. According to the State, the same investigator who helped prosecute Curry's husband might have been called as a witness for the State in Flowers's trial.[18] I find these two reasons race-neutral and a sufficient explanation as to why the State struck Curry from the venire.

¶91.    As to the third element, this Court has recognized considerations to help determine whether pretext exists:

> [T]he extent and nature of voir dire on the grounds upon which the strike is being exercised; the relation between the reasons for the strike and the facts of the case; the demeanor of the attorney and the prospective juror; and, disparate impact upon a minority or gender class.

*Randall*, 716 So. 2d at 588-89 (footnotes omitted). As discussed above, we have held that a prosecutor does not have to question a juror in open court about a reason the prosecutor uses to strike a prospective juror. Also, the relation between the reasons for the strike and the facts of this case are strong. First, the State does not want jurors sitting on the jury who are acquainted with the defendant or his family, considering the possible conflict created between a person's natural tendency to align with a friend or acquaintance, and the inability to put aside that bias and make a decision based solely on the evidence presented. Also, the State

---

[18] This argument, that John Johnson might be called as a witness in the Flowers's trial, was first presented at the appellate level.

does not want jurors whose relatives have had run-ins with the law, and thus might have a disposition to distrust law enforcement who are likely to testify on the State's behalf.

¶92.    We are unable to gauge the demeanor of the attorney and juror, as we are presented only with a record. As such, we must defer to the trial judge and his considerations on this point. *See Lynch*, 877 So. 2d at 1271 ("the demeanor of the attorney making the challenge is often the best evidence on the issue of race neutrality") (quoting *Walker v. State*, 815 So. 2d 1209, 1215 (Miss. 2002)).  Finally, as to the disparate impact on a minority class, the State points out a fact that distinguished Curry's situation from similar jurors.  The State argues the same investigator who helped prosecute Curry's husband might have been called as a witness to testify in Flowers's trial.

¶93.    With regard to the plurality's findings as to Pittman, I agree with the State's contention that Flowers is barred from having this issue considered on appeal because Flowers failed to rebut the State's reason proffered at the trial court.  *See Manning v. State*, 726 So. 2d 1152, 1182 (Miss. 1998) (overruled on other grounds) (defendant waives right to contest a strike against a potential juror where defense counsel offers no rebuttal to prosecutor's challenges).  Notwithstanding the procedural bar, I am also concerned with the plurality's finding that discrimination occurred, because the only reason given by the State was unsupported by the record.  It is important to note the entire discussion between the parties and the trial judge regarding the race neutrality of the States peremptory strike.  The State indicated that it had other reasons for striking Pittman, but when the defense failed to rebut the State's first reason, the trial judge announced his finding.  The likelihood that the State may have asserted

56

additional valid reasons for its peremptory strike against Pittman must not be excluded in our analysis.

¶94.    For the reasons mentioned above, I find the State did not violate *Batson*, and that the trial judge properly upheld the State's peremptory challenge on Curry.  Similarly, I find no error with the State's decision to strike Pittman.  Therefore, I would affirm the trial court's judgment.

**EASLEY, CARLSON AND RANDOLPH, JJ., JOIN THIS OPINION.**